THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CARLO A. NELSON, JR., Defendant-Appellant.

Second District   No. 2—85—0619

Opinion filed October 29, 1986.

Daniel D. Yuhas and Jane Raley, both of State Appellate Defender's Office, of Springfield, for appellant.

James E. Ryan, State's Attorney, of Wheaton (Kenneth R. Boyle, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Carlo A. Nelson, Jr., was charged by information with the offenses of indecent liberties with a child, deviate sexual assault, and rape. (Ill. Rev. Stat. 1983, ch. 38, pars. 11–4(a)(1), 11–3(a), 11–1(a).) He was found guilty on all three counts and sentenced to concurrent six-year terms in the Department of Corrections for the offenses of deviate sexual assault and rape. He contends he was not proved guilty beyond a reasonable doubt, where the evidence showed no act of resistance, no prompt complaint, and no corroborating evidence, and that the improper admission of prejudicial hearsay was reversible error.

The complainant, Jennifer M., testified she was 14 years old at the time of the incident. She weighed approximately 110 pounds and was 5 feet 3 inches tall. At 6 p.m. on November 8, 1983, she and two friends, Kelly Studlo and Christine Hackerson, appeared at the defendant's house. The defendant, along with his cousin, Patrick Peale, lived in his aunt's townhouse at 133 West Ogden Avenue in Naperville.

The three girls were runaways and had been missing for four or five days. They asked the defendant if they could stay overnight at

the house. The defendant informed the girls that the police were looking for them and then invited them to stay. The defendant bought the girls some beer at their request, and they spent the evening in the living room of the house, drinking beer, playing cards and watching television.

Eventually, Kelly Studlo and Christine Hackerson fell asleep on couches that were located in the living room. Patrick Peale was sleeping upstairs. Jennifer and the defendant continued to talk in the living room for at least two more hours.

The defendant offered to show Jennifer some guns which were located in the basement of the house. After they walked down the stairs to the basement, the defendant said, "I want you now, and I know you want me." Jennifer replied, "No, I don't" and tried to go back upstairs, but the defendant grabbed her by the hair and started kissing her on the face and lips. The defendant unsnapped Jennifer's blouse and broke the hook of her bra but did not remove either. Jennifer testified that up until this point she had not been threatened. Jennifer testified she was then pushed from a standing position onto the concrete floor, and the defendant threatened to hurt her if she did not cooperate. She sat up, and he pushed her to the floor again. The defendant then took off his jeans and told her to remove her jeans. He attempted to put his penis into her vagina but penetration did not occur at that point, and they both stood up. The defendant told Jennifer to get down on her knees. When she refused to do so, he pushed her down to her knees by placing his hands on her shoulders, and he then put his penis into her mouth. He held onto his penis and moved it back and forth in her mouth; she was gagging at this time and trying to throw up. She was then pushed down completely onto the floor where the defendant put his penis into her vagina. When she started screaming, he put one hand over her mouth. When she continued to scream, he used both hands to choke her neck, and she stopped screaming. When she began again, the defendant began to choke her again. They had intercourse for a couple of minutes. She was on her back on the floor and he was on top of her, moving. She continued to try to scream and yell and make as much noise as possible, while the defendant had his hands over her mouth or was choking her. The defendant then made Jennifer get up on her knees again, and he put his penis into her mouth a second time. She tried to gag and throw up again.

Jennifer denied that she asked the defendant to give her some cannabis and denied that he said he had some in the basement but that he did not want to give her any. She also denied having looked

around the house for some cannabis. Jennifer testified that she screamed and yelled for help as loud as she could about four times during the entire incident. She estimated that the distance from where she and the defendant were located in the basement to where her girlfriends were located in the living room was a little more than 20 feet. She testified that each time she screamed, the defendant put both of his hands around her neck and choked her. It hurt her when he choked her, but the choking caused no bruises around her neck. She further testified that she tried to run upstairs several times and that when the defendant was on top of her she tried to push him away and to squirm out from underneath him. She testified that the defendant never hit or punched her during the incident. She did not know if the defendant ejaculated in her, and she did not wipe herself off.

Afterward, Jennifer testified the defendant picked up the telephone and said he was going to call the police. She told him to go ahead, then got up, put on her clothes and ran upstairs into the living room where her girlfriends were still sleeping. Jennifer shook Kelly Studlo and Christine Hackerson and yelled at them saying, "Carlo just raped me. Let's get out of here. Wake up." She testified that her friends were starting to wake up, but that, when she heard the defendant coming upstairs, she ran out of the house. She hid behind a dumpster outside. The defendant followed her outside and apologized to her. They returned to the house together. Jennifer testified she took a knife out of Kelly Studlo's purse and sat down on a couch in the living room until her friends awakened in the morning. The defendant lay down on a couch in the living room across from her and fell asleep. The next morning, November 9, Kelly Studlo woke up, and Jennifer wrote a note which stated, "Carlo raped me last night" and gave it to Kelly.

Jennifer testified that she last laundered her underpants on the morning of November 8, 1983. The girls were staying at another person's apartment, and the underpants were washed in the washer with detergent and then dried in the dryer. She testified she took off the underwear on the night of November 9, and that between the morning of November 8 and the evening of November 9 she had intercourse with no one but the defendant.

Jennifer and her two girlfriends left the defendant's house about 2 p.m. on November 9. She testified that she did not report the rape to the police because she and her friends were runaways. On the evening of November 9, she was picked up by the police for being a runaway but did not inform them that she had been raped. When asked

why she did not tell the police, she testified, "I wasn't sure at that point if I was even going to say anything." Jennifer was taken to her home later that night. She did not tell her mother that she had been raped until the morning of November 10, and on November 11 she submitted to a physical examination. Jennifer testified that she observed a "redness" and a "soreness" around her vaginal area and informed the examining doctor of this fact.

Christine Hackerson testified that she, Jennifer M. and Kelly Studlo arrived at the defendant's residence at about 6 p.m. on November 8, 1983. She and Kelly Studlo got drunk and passed out about 11 p.m. on some couches that were located in the living room. Christine testified that at about 2 or 3 a.m., Jennifer shook her and Kelly awake. Jennifer was crying and shaking. Christine and Kelly sat up, and Jennifer said, "We've got to leave" and, "We must leave." The girls asked Jennifer why they had to leave. Christine testified Jennifer gave Kelly a piece of paper which had the words "Carlo raped me last night" printed on it. Jennifer left the house, and the defendant came upstairs 5 or 10 minutes later and asked where Jennifer was. The girls told him that she went outside, and Christine testified the defendant stated that he "must have been a little rough on her." The defendant then went outside to look for Jennifer. The defendant and Jennifer returned together to the house shortly thereafter. Jennifer was still crying and shaking. Jennifer sat down on the couch between Kelly and Christine, and she was quiet but still shaking.

Christine Hackerson testified during cross-examination that she is a light sleeper and that on the night of November 8 and during the early morning hours of November 9 she was not sleeping in a deep sleep but was kind of "passed out." She could hear the sound of the television off and on while she was sleeping. She testified she did not hear Jennifer scream or yell. She testified that when Jennifer came upstairs and woke her and Kelly saying she wanted to leave, she did not tell them why. Christine admitted that in her statement to the police she said she did not believe Jennifer had been raped. She testified that she wrote that because she did not see anything physically wrong with Jennifer except that she was emotionally upset. She said she expected there would be "bruises or something." She did not see any bruises on Jennifer's face, and she did not observe Jennifer's neck at that time. Christine testified that she had the conversation with Jennifer about the note when Jennifer first came upstairs, and that Jennifer talked about the rape later that same morning, while they were still at the defendant's house, and then later yet at a forest preserve where they went.

Naperville city police officer Charles Hoyer testified that on November 12, 1983, at the stationhouse, he interviewed the defendant regarding his contact with the three runaway girls. Officer Hoyer advised the defendant that he could leave at any time. The defendant stated that the runaway girls had stopped by his house on the evening of November 8, 1983. The defendant told them that they should go home and that they then left. Officer Hoyer informed the defendant that the three girls all stated that they had stayed the night. The defendant then changed his story and stated that he did let them stay, because it was cold outside and he felt sorry for them. The defendant then stated that the girls gave him $5 and he used the $5 to purchase some beer and that the girls drank the beer that evening. The defendant stated that eventually his cousin Patrick Peale went upstairs to bed. Christine Hackerson and Kelly Studlo fell asleep on couches, and he continued talking with Jennifer. Officer Hoyer asked the defendant whether he took Jennifer to the basement and the defendant said no. The officer then told the defendant that Jennifer had stated that he had taken her to the basement. The defendant then changed his story and admitted going to the basement with her. When Officer Hoyer asked the defendant what happened in the basement, the defendant stated that he would like to talk to a lawyer and asked if he could leave. The officer then drove the defendant home. Officer Hoyer testified that Carlo Nelson was 5 feet 10 inches tall and weighed about 150 to 160 pounds.

Mohammad A. Tahir, a forensic scientist, testified that on January 3, 1984, he examined Jennifer's underpants for the presence of seminal material. After performing a series of tests, Tahir was of the opinion that semen was present on the underpants. Tahir testified that he had no opinion as to the age of the seminal stain. Tahir testified that seminal stains on clothing usually disappear after washing the clothing with detergent in the washing machine. The State then rested.

Dr. Joseph Wood, a medical doctor, testified that on November 11, 1983, at approximately 4 p.m., he examined Jennifer. Jennifer told the doctor that on November 8, 1983, she had been forced to submit to vaginal intercourse and forced to perform oral sex. She also informed the doctor that she had been choked around the neck by the person's hands. Dr. Wood testified that after examining Jennifer's body externally, he was unable to find any sign of injury. No bruises or abrasions were found around her neck area, and in his opinion, no significant force had been applied to the internal organs of the neck. Dr. Wood further testified that Jennifer's vaginal area showed no signs of recent trauma or injury.

Patrick Peale, the defendant's cousin, testified that on November 8, 1983, Jennifer, Christine Hackerson and Kelly Studlo came to the house where he resided with his mother and his cousin, the defendant. It was about 7 p.m., and the defendant let the girls come into the house. Peale described the house as having thin walls and as being divided into three levels. The basement consisted of one large room and was separated from the main floor by two flights of about five stairs each, separated by a landing. The main floor consisted of a living room, bathroom, and kitchen and was separated from the next story by about 10 or 12 stairs. The second floor consisted of two bedrooms and a bathroom.

Peale testified that during the course of the evening, the defendant and the three girls watched television in the living room of the house and each of them drank one or two beers, which the defendant had gone out to get. At about 9:45 p.m., Peale testified he went upstairs to bed. He testified that he slept in his mother's bedroom, next to a vent which leads to the basement of the house. He further testified that when near the vent, one can hear noises from the basement. Peale estimated that the distance between the bedroom where he slept and the basement was about 30 feet. Peale fell asleep at about 10:30 p.m. and woke up at 6:45 the next morning. He testified that he is a light sleeper, and that between the time he fell asleep and the time he woke up, he heard no yelling, screaming, or shouting from the basement of the house. He testified that he left for school about 7:30 a.m. The defendant was sleeping in Peale's bedroom on the second floor, and the three girls were awake and talking in the living room. Peale stated that he did hear a little noise from the television that night, but that it was not enough to keep him awake. He also thought he heard someone use the downstairs bathroom, but that he did not pay much attention to it.

The defendant testified that on November 8, 1983, at about 6 or 7 p.m., Jennifer, Kelly Studlo and Christine Hackerson appeared at his aunt's house in Naperville. He was living there temporarily; he was 20 years old at the time. The girls told him that they were runaways and needed a place to stay overnight. He invited the girls inside. He bought a 12-pack of beer with money the girls gave him, and they all spent the evening watching television. The defendant testified that he drank two beers; he could not remember how many beers each of the girls drank. Eventually, Patrick Peale went upstairs to bed, and Kelly Studlo and Christine Hackerson fell asleep on couches in the living room. Jennifer and he continued to talk for about one or two hours.

Defendant testified that at about 1 a.m., Jennifer asked him

whether he had any marijuana. He replied that he had a "ton of it in the basement." Jennifer went downstairs and the defendant followed. She began rummaging through a stereo cabinet, a clothes hamper, and a laundry bag, asking where the pot was. The defendant told her that he did not have any marijuana, and that he had been joking, but she continued to search through the basement for marijuana. The defendant told her stop, grabbed her arm and pushed her. He testified she did not scream or yell, but that she gritted her teeth and sort of sneered and made a growl-like noise at him. After Jennifer ran upstairs, the defendant testified he thought he had knocked the phone off the hook, and that he was putting some things back in order. He then went upstairs and saw Jennifer exiting the door, going outside. Christine Hackerson and Kelly Studlo were half-awake, and they asked him what the matter was with Jennifer. He testified he thought he replied, "She's crazy." The girls asked him to go see what was wrong with her. He did so but was unable to locate her. He finally saw her walking toward him as he was coming back toward the house. Defendant testified Jennifer said something like, "You lied to me" and, "You hurt me." She was grabbing her arm as she was saying this. The defendant explained to her that if he put her out he would have to put her friends out, too, so they could stay the night and leave in the morning. She went back in, as did defendant. Defendant began watching television. He slept lightly and eventually went upstairs at 7:30 or 8 a.m. to wash his face. Then he went to his cousin's room and lay down for about half an hour. Later he and the girls watched television until the girls left at approximately 2 p.m.

The defendant denied that he had any type of sexual intercourse or oral sex with Jennifer or that he tried to choke her.

On cross-examination the defendant stated he and Jennifer were downstairs for anywhere from 10 to 20 minutes, during which time she was searching through the stereo cabinet, the hamper, and a laundry bag. He stated that Jennifer was not crying when she went upstairs. He admitted he did not tell the police the story about the drugs and about Jennifer searching through all the items in the basement. He also admitted he did not call the police to report the girls as runaways or to report Jennifer for pawing through all the items in the basement.

As noted, the trial court found the defendant guilty on all three counts.

■■ ■ The defendant first asserts there was insufficient evidence to prove that the acts of rape and deviate sexual assault were committed by force and were against Jennifer's will. He points to the fact

that no one in the house heard Jennifer's screams and to the fact there was no physical evidence of a struggle and contends such facts imply that Jennifer made no serious physical effort to resist. Moreover, he argues the instant cause is not one in which proof of resistance need not be shown. Thus, he asserts, where Jennifer's testimony was not clear and convincing, the record must show corroborative evidence that the acts were performed by force and against the will of the female in order to sustain the conviction. He contends such corroborative evidence is lacking here, where there was evidence only of a broken bra hook and a seminal stain of undetermined age, and where there was no prompt complaint but, rather, an unexplained delayed complaint.

In prosecutions for rape and deviate sexual assault, the State is required to prove beyond a reasonable doubt that the accused had sexual intercourse with the complainant or compelled the complainant to perform or submit to an act of deviate sexual assault. (*People v. Watts* (1985), 139 Ill. App. 3d 837.) To prove the charge of rape, the State must show that the intercourse was committed by force and against the will of the female. (*People v. Cornes* (1980), 80 Ill. App. 3d 166; *People v. Genus* (1979), 74 Ill. App. 3d 1002.) The nature of the force or threat of force which must be proved in a prosecution for deviate sexual assault is the same as that for rape. (*People v. Walsh* (1980), 80 Ill. App. 3d 754, 764; *People v. O'Brien* (1979), 74 Ill. App. 3d 256, 258.) There is no absolute standard setting the amount of force required to establish a rape (*People v. Barbour* (1982), 106 Ill. App. 3d 993), and each case must be considered on its own facts (*People v. Thomas* (1981), 96 Ill. App. 3d 443).

■■■ It is well settled that if the complainant had the use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will. (*People v. Taylor* (1971), 48 Ill. 2d 91.) Resistance is not necessary under circumstances where resistance would be futile and would endanger the life of the female, such as where the assailant is armed with a deadly weapon, and proof of physical force is unnecessary if the complainant was paralyzed by fear or overcome by the superior strength of her attacker. (*People v. Faulisi* (1962), 25 Ill. 2d 457; *People v. Warren* (1983), 113 Ill. App. 3d 1, 6.) In the absence of such circumstances, the lack of resistance by one able to so resist conveys the impression of consent; complainant's lack of consent must be conveyed in some objective manner. *People v. Warren* (1983), 113 Ill. App. 3d 1, 6.

■ The force element of rape does not depend for its proof on actual physical damage to bodily tissue (*People v. Szudy* (1982), 108 Ill.

App. 3d 599, 606), however, and a rape victim is not required to subject herself to serious physical harm by resisting in order to establish that intercourse was nonconsensual. (108 Ill. App. 3d 599, 606; *People v. Sims* (1972), 5 Ill. App. 3d 727.) Neither is it required that the victim physically resist before it may be said that a rape has occurred. *People v. Patterson* (1980), 90 Ill. App. 3d 775, 781.

■■ ■ In order to sustain a conviction for rape, the testimony of the victim must be clear and convincing, or corroborated by some other facts and evidence. (*People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 1024.) Where a complainant's testimony is clear and convincing, that testimony is sufficient to support a conviction without the necessity of corroborative evidence. (*People v. Secret* (1978), 72 Ill. 2d 371; *People v. Watts* (1985), 139 Ill. App. 3d 837.) The requirement that a complainant's testimony be clear and convincing does not mean that it must be uncontradicted or unimpeached. (*People v. Coe* (1978), 67 Ill. App. 3d 552.) If discrepancies do not detract from the reasonableness of the complainant's story as a whole, her testimony may be found clear and convincing. *People v. Payton* (1980), 84 Ill. App. 3d 181, 183.

■■ The credibility of the complainant is an issue best determined by the trier of fact, who heard the testimony and observed the demeanor of the witnesses. (*People v. Sanchez* (1982), 110 Ill. App. 3d 893.) Despite the special duty of a reviewing court to scrutinize closely the sum and substance of the evidence upon which a conviction for a sex offense is predicated (*People v. Faulisi* (1962), 25 Ill. 2d 457, 461), a reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of evidence or credibility of the witnesses (*People v. Baseer* (1980), 90 Ill. App. 3d 866; *People v. Edmond* (1979), 76 Ill. App. 3d 540), and may not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of guilt (*People v. Morgan* (1986), 112 Ill. 2d 111; *People v. Jennings* (1986), 142 Ill. App. 3d 1014, 1033).

■■ We do not find the evidence here was so improbable as to raise a reasonable doubt of the defendant's guilt. Initially, we agree with the defendant that this is not a case in which resistance would have been futile and need not have been shown. No weapon was involved, and Jennifer's own testimony refutes any implication that she was paralyzed by fear or overcome by the superior strength of the defendant. In assessing the degree of force and amount of resistance shown in this cause, however, we believe it is proper to consider several intangible factors which may have contributed to the force per-

ceived by Jennifer. *Cf. People v. Warren* (1983), 113 Ill. App. 3d 1, 5 (where the court considered it was proper to consider whether the seclusion of the wooded area in which the deviate sexual assault occurred contributed to the defendant's threatened use of physical force).

Jennifer was 14 years old; the defendant was 20. He was 7 inches taller and weighed 40 to 50 pounds more than she. She knew that the defendant knew that she was a runaway and that the police were looking for her. It was cold outside, and she apparently did not have any type of outerwear. It was about 2 o'clock in the morning. Her shelter on this occasion, as well as that of her two already-sleeping, "passed-out" friends, was completely dependent upon the beneficence of the defendant. The defendant's threat to hurt her if she did not cooperate could be carried out and she would have little means of seeking redress. Despite the defendant's obvious advantage over her, we believe the evidence supports the court's conclusion that the intercourse and deviate sexual act which occurred were not consensual.

As the State notes, the court found Jennifer's testimony was direct and adult and that she had no reason to falsify her testimony. It also found she was a more credible witness than the defendant. The evidence is clear that the defendant lied to the police and that he changed his story when confronted with the contrary statements made by the girls. Such conduct evidences a guilty conscience and serves to enhance the credibility of Jennifer's testimony. (*People v. Mueller* (1954), 2 Ill. 2d 311, 314-15; *People v. McKnight* (1979), 72 Ill. App. 3d 136, 142.) The court felt the fact that no one heard Jennifer's screams could have been attributable to a number of factors, such as the amount of alcohol consumed by Christine Hackerson, the noise made by the television, the physical layout of the house could have hampered conveyance of the noise, and the fact Jennifer may have thought she was yelling more strongly than she actually was.

We note Peale and Hackerson testified to hearing the television while they were sleeping, but not all the time, and Peale testified the heat was on in the house. It may be inferred their normally light sleeping patterns included periods of deeper slumber which blanked out sounds. It may likewise be inferred that Jennifer's screams were largely muffled when the defendant placed his hand over her mouth and when he choked her.

Even absent the screams, there was other evidence Jennifer resisted the defendant. She tried to run up the stairs several times, and testified to gagging and "trying to throw up" when the defendant forced his penis into her mouth. She also tried to push him away, and

she tried to squirm out from underneath him. Moreover, she testified she was unable to keep her legs together because his legs were between hers.

◼◼ The absence of evidence of physical trauma similarly does not render Jennifer's testimony so improbable as to raise a reasonable doubt of the defendant's guilt. Although she testified the defendant pushed her down onto her knees on the concrete floor several times, she testified it did not hurt her. When the defendant choked her, she said it did hurt, but that no bruises developed. Dr. Wood testified that whether a bruise or abrasion would result from choking would depend on how the choking was accomplished, such as with a rope or by hands, how long the choking continued, and with what degree of force. Jennifer testified the defendant's choking of her caused her to stop screaming and interfered with her breathing. It may be inferred that the degree of pressure and duration of the choking required to bring about these two results was simply insufficient to cause a bruise or abrasion to develop, and not that the choking did not occur. The lack of trauma to Jennifer's vaginal area is similarly insufficient to negate defendant's guilt. Jennifer did not testify that the actual act of intercourse was particularly violent or forceful or that it hurt, and she testified that it lasted only a couple of minutes. Although Dr. Wood did not observe the redness or soreness of which Jennifer complained, the evidence showed she had begun menstruating on November 10, and Dr. Wood's examination took place on November 11, three days after the incident occurred. The absence of noticeable vaginal trauma after a lapse of only eight hours has been found not to inject such doubt of a defendant's guilt as to require reversal. *People v. Szudy* (1982), 108 Ill. App. 3d 599, 606.

We agree with the State that the cases relied upon by defendant for reversal, *People v. Bruno* (1969), 110 Ill. App. 2d 219, and *People v. Faulisi* (1962), 25 Ill. 2d 457, are distinguishable on their facts and, as noted above, there is the additional circumstance here that the discrepancies in the defendant's account of the incident to the police operated to enhance Jennifer's credibility.

In sum, we find the complainant's testimony was clear and convincing and sufficient to sustain the defendant's conviction. As such, no other corroborative facts or evidence were necessary, but there was ample such evidence in the record.

◼◼ In addition to Jennifer's broken bra hook, there was evidence of a seminal stain of undetermined age or origin found on Jennifer's underpants. Although the defendant correctly notes that such evidence by itself is insufficient to establish that rape had occurred in

the absence of a complainant's clear and convincing testimony (*People v. Anderson* (1974), 20 Ill. App. 3d 840), we have found that there was such testimony here. Moreover, Jennifer testified she did not have intercourse with anyone except the defendant after she last washed her underpants and, in view of her runaway status, she had particular reason to remember when and where that washing took place.

The court also found particularly corroborative, and we do also, Jennifer's "prompt complaint"; that is, the note Jennifer wrote and gave to Kelly Studlo which read: "Carlo raped me last night." Quite obviously the note was not written contemporaneously with the occurrence of the event. As the court correctly observed, however, the evidence showed that Jennifer went upstairs immediately after the incident and tried to tell her girl friends what had happened. She was unable to awaken them sufficiently to make herself understood before the defendant came upstairs, however, and she went outside when she heard him coming. She returned to the house, not only because her friends were there, but because the defendant told her—and the defendant so testified he told her—that if he put her out, all three of them would have to go. Jennifer returned to the house, but armed herself with a knife, sat up most of the night, and when Kelly Studlo awoke in the morning, Jennifer gave her the note.

> "In rape cases, the fact that the prosecuting witness made a complaint of the offense is admissible on direct examination to corroborate her testimony. The evidence is permitted on the basis that it is entirely natural that the victim of a forcible rape would speak out regarding it. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; see also Cleary & Graham, Handbook of Illinois Evidence sec. 611.15 (4th ed. 1984).) While there is no fixed time with which the complaint must be made, it must be made without inconsistent or unexplained delay. (*People v. Davis* (1957), 10 Ill. 2d 430, 140 N.E.2d 675, *cert. denied* (1957), 355 U.S. 820, 2 L. Ed. 2d 35, 78 S. Ct. 25; *People v. Fuelner* (1982), 104 Ill. App. 3d 340, 432 N.E.2d 986; *People v. Robinson* (1981), 94 Ill. App. 3d 304, 418 N.E.2d 899.) However, the complaint must be voluntary and spontaneous and thus not made as a result of a series of questions. *People v. Taylor* (1971), 48 Ill. 2d 92, 268 N.E.2d 865." *People v. Harris* (1985), 134 Ill. App. 3d 705, 713-14.

In cases where delays have been found to have occurred but without diminishment of the corroborative value of the complaint, the common causes of the delays were found to be that the complainants

were either incoherent, fearful, hysterical, or emotional. (*People v. Harris* (1985), 134 Ill. App. 3d 705, 714; *People v. Slavin* (1978), 66 Ill. App. 3d 525.) When the complainants found a place or person lending them security, they made the charge as an outpouring of injury. *People v. Houck* (1977), 50 Ill. App. 3d 274.

Defendant contends the complaint here was inexplicably delayed, since Jennifer did not complain as soon as practicable, referring to the time when she first ran out of the house. It was the middle of the night, however, and there was no immediate person or place "lending her security." The reason she returned to the house is clear, and the fact she armed herself with a knife evidences her fear of the defendant. She also testified the defendant threatened to call the police and report them as runaways, but that he did not. Further, her secretive method of conveying the complaint to Kelly surely shows she believed the defendant posed a continuing threat to her. Under the circumstances of the case, we find her failure to report the matter to the police was explained by the fact she was a runaway and she was afraid of what would happen to her friends. In this instance, the police were not viewed by her as security, rather, as a threat. Since she was a runaway, it may also reasonably be inferred that her home and her mother similarly did not represent to her a place or person which lent her security.

■ Also corroborative of Jennifer's testimony was Christine Hackerson's testimony that Jennifer was crying and shaking when she first came upstairs, and that when she returned to the house with the defendant she was quiet, but still shaking. Moreover, Christine testified that the defendant stated he "must have been a little rough on her," whereas the defendant testified he stated, "She's crazy."

In view of the complainant's clear and convincing testimony, as well as the additional corroborative evidence noted above, we find the evidence was sufficient to sustain the defendant's convictions.

■ We find it unnecessary to address defendant's final contention that it was error for the court to admit the note in evidence since it constituted improper and prejudicial hearsay. The State points out the defendant failed to object to the admission of the note at trial (*People v. Trefonas* (1956), 9 Ill. 2d 92; see also *People v. Slavin* (1978), 66 Ill. App. 3d 525), or to bring the matter to the court's attention in his post-trial motion. Although the filing of a post-trial motion in a bench trial has been found unnecessary to preserve an error for review, the error nevertheless must somehow have been brought to the attention of the trial court or it is considered waived. (*People v. Sprouse* (1981), 94 Ill. App. 3d 665, 676-77.) The error at issue was

not brought to the trial court's attention in any manner. The defendant has not argued plain error, and we perceive none.

Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Judgment affirmed.

HOPF and LINDBERG, JJ., concur.