THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NATHAN PALMER, Defendant-Appellant.

First District (3rd Division)   No. 1—87—3544

Opinion filed December 29, 1989.

Randolph N. Stone, Public Defender, of Chicago (Stephanie L. Ellbogen, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Kenneth McCurry, and Judith M. Gilson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a bench trial, defendant Nathan Palmer was found guilty of three counts of criminal sexual assault and sentenced to serve four years in the Illinois Department of Corrections. On appeal, defendant argues that he was not proven guilty beyond a reasonable doubt. We affirm.

The following facts are undisputed. On December 17, 1986, at approximately 10:30 p.m., Mitzi Scott was trying to place a phone call at a pay telephone located at a fire station at Larabee and Division Streets in Chicago. Mitzi was unable to reach the party she was calling and began to speak with defendant, who was standing nearby. Mitzi and defendant had known each other for about one or two years, and defendant had visited her in her home on at least one occasion. Mitzi asked the defendant for a cigarette, and he went to the store across the street, purchased a package of cigarettes and gave her two. At approximately midnight, defendant walked Mitzi back to her apartment building, which was in a Chicago Housing Authority complex across the street. Mitzi went to her apartment and began to cook dinner.

Defendant purchased some marijuana and later stopped by Mitzi's apartment to make sure she had gotten home safely. When defendant arrived Mitzi was cooking dinner, and she invited him in to visit. Defendant joined Mitzi in the kitchen while she finished cooking her meal. Defendant offered Mitzi a marijuana cigarette and they smoked it together. Mitzi offered defendant some food, but he told her he was not hungry, so she fixed herself a plate of food, and they went into the living room and watched television while Mitzi ate her dinner. When Mitzi finished eating, she went to the kitchen, and defendant followed her to get his coat so that he could leave. At this point Mitzi's and defendant's versions of the events diverge.

Mitzi testified that she got another glass of Kool Aid and defendant got his coat. She stated that she began to walk back toward the living room with defendant following behind her. She testified that as she

reached the hallway, defendant grabbed her from behind, placed his right arm around her neck and his left arm underneath her shoulder and told her to put her cup on the closet shelf located in the hallway. Mitzi testified that after she placed the cup down, defendant turned her around in the opposite direction and began to push her from behind. She stated that she took a couple of steps and then told defendant to stop. Mitzi testified that defendant stated, "[Y]ou are going to give me some pussy." Mitzi asked defendant what was happening, and he repeated the above phrase.

Mitzi then began to plead with defendant and tell him that he didn't want to do this and that it didn't have to be this way. Defendant continued to push Mitzi down the hallway while she tried to push him back. Defendant pushed Mitzi up against the wall next to the bathroom, and Mitzi told him that she didn't sleep with someone just because they wanted to sleep with her. Defendant slapped her in the face and told her to take off her clothes. Mitzi testified that she began to size defendant up and try to figure out what to do. She stated that since defendant was six feet tall and weighed 200 pounds, she decided to cooperate while still trying to talk her way out of the situation. She stated that she took off her shirt, shorts and underpants. Defendant then grabbed her arm and forced her into her son's room.

Defendant stood in the doorway and began to take off his clothes. When defendant got his pants down to his shins, Mitzi ran into him and knocked him down. She attempted to run past defendant, but he grabbed her by the ankle, and she fell to the floor. She and defendant began to wrestle. Mitzi testified that defendant tried to get on top of her and that she kicked and pushed him away while inching her way down the hallway towards the front door. After the struggle moved about half-way down the hall, defendant got on top of Mitzi and began to choke her. Mitzi began pushing defendant's face with her hand, her thumb slipped into his mouth and he began to bite her left thumb.

Mitzi testified that she managed to reach her front door, get it unlocked and scream for her neighbor, but no one responded. She further stated that she bit defendant's lip to try to get her thumb out of his mouth, and defendant stood up, grabbed her by her hair and pulled her down the hall to her son's bedroom. Mitzi testified that when they got to her son's room, she got to her feet and defendant tried to close the door while she attempted to keep it open with her foot. She testified that she was exhausted from the struggle, and defendant closed the door. Defendant pushed her down on the bed facing him and told her to perform oral sex on him. Defendant grabbed Mitzi by the head while she begged him not to do this to her, and he put his penis in her mouth.

Mitzi kept telling defendant that she was going to get sick and after about three minutes, defendant removed his penis from her mouth. Defendant pushed Mitzi down on the bed and performed oral sex on her. Mitzi continued to ask defendant to stop. Defendant then got up and put his penis in Mitzi's vagina for about five minutes, after which he got up, told her to lay lengthwise on the bed and put his penis into her vagina again for about 10 minutes. Defendant complained that he could not maintain his erection and began to pace the floor and say that he was scared, sorry and did not want to go to jail.

Mitzi told defendant that her finger was hurting, and defendant asked her if anyone else had a key to the apartment. Mitzi told defendant that she was expecting a friend for dinner. Defendant took Mitzi to the front door, checked the lock, put the chain on the door and took her back to her son's room. Defendant closed the bedroom door, removed a pillowcase from the pillow and threatened to choke Mitzi with it, stating he would rather jump out of the window than go to jail. Mitzi pleaded with defendant not to kill her because she had to take care of her baby. Defendant told Mitzi that if she hollered he would strangle her with the pillow case. Mitzi promised not to holler. Defendant put his penis into Mitzi's vagina again for about 10 minutes and then stopped and sat on the side of the bed. Mitzi asked defendant if he had any sisters or daughters and how would he feel if someone did this to them. Defendant then started to cry and apologize. Mitzi promised not to tell anyone if defendant allowed her to live to raise her baby. Defendant then made the victim stand up and turn around and he put his penis into her vagina again for about 15 minutes before finally ejaculating.

Defendant apologized to the victim and asked her if she wanted to go to the hospital for her thumb injury. Defendant then washed the blood off of Mitzi and himself and gave her a dollar to get home from the hospital. After Mitzi and defendant were dressed, defendant locked her apartment door and took her to the fire department to call an ambulance. When they arrived at the fire department, defendant told the fireman on duty, who was a friend, that Mitzi had injured her finger in a fight and needed an ambulance. The fireman cleaned and bandaged the victim's finger and called an ambulance. When the ambulance arrived, defendant borrowed some money from the fireman and gave it to Mitzi. Mitzi was taken to Grant Hospital and treated for her thumb injury. She also reported her sexual assault to the hospital staff after talking with her boyfriend by telephone. Mitzi received two stitches to her thumb, and a vaginal swab sample was taken.

Defendant made a pretrial statement which was admitted into evi-

dence. In his statement, defendant admitted that he grabbed Mitzi around the shoulder and asked her for sex while they were standing in the hallway of her apartment. Defendant further stated that he took the victim into the bedroom and that she removed her clothes. Defendant admitted that Mitzi tried to get out of his grasp and that they started wrestling on the floor. Defendant stated that he took Mitzi to the bed, and she asked him if he was going to kill her. Defendant told the victim that he would not hurt her. Defendant admitted having vaginal and oral sex with Mitzi. Defendant stated that Mitzi showed him her bleeding thumb and he stopped having sex with her and apologized for what he had done. Defendant then offered to give her a dollar for carfare to the hospital. Defendant helped the victim get dressed, dressed himself and apologized again. Defendant then took Mitzi to the fire station, borrowed some money from a friend, gave it to Mitzi for cab fare and waited with Mitzi until the ambulance arrived.

Pictures of the victim's son's bedroom with bloodstains on the bedspread and floor were admitted into evidence. In addition, the parties stipulated that the vaginal swab taken from Mitzi tested positive for sperm.

Defendant testified on his own behalf and stated that on the night he visited Mitzi's apartment, Mitzi bumped into him in the hallway and he put his arms around her, kissed her and said let's make some love. He further testified that Mitzi did not scream or push his arms away. He stated that he grabbed her hand and asked her to come in the back and that Mitzi did not pull away or scream. Defendant testified that they went into the bedroom and he asked her if they were going to make love. He stated that they kissed again and then they laid down on the floor and continued to kiss and caress each other. Defendant testified that while they were lying on the floor, Mitzi said that it did not have to be that way. Defendant stated that Mitzi took all of her clothes off before lying down on the floor. He testified that he never struck Mitzi and she did not scream or cry out. Defendant testified that he asked Mitzi to perform oral sex on him and that she agreed. He further testified that after approximately two minutes, he laid her on the bed and performed oral sex on her. Defendant stated that they then had intercourse with him on top and with Mitzi standing up and bending over.

Defendant testified that when Mitzi told him that her hand was "big," he looked at it and told her she needed to go to the hospital. He stated that he never threatened to strangle her with the pillowcase, but admitted that he threatened to kill himself. Defendant stated that he had no idea how Mitzi injured her finger. He further stated that he

washed the blood off of her thumb and helped her get dressed. Defendant testified that he walked the victim over to the fire station to call an ambulance. He stated that he waited with Mitzi until the ambulance came and gave her some money he borrowed from a friend at the fire station so that she could take a cab home.

Following closing arguments, the court found defendant guilty of three counts of criminal sexual assault. Following the sentencing hearing, the court sentenced defendant to serve four years in the Illinois Department of Corrections. This appeal followed.

Defendant argues that he was not proven guilty of criminal sexual assault beyond a reasonable doubt. It is his position that the State failed to prove that he used force to commit the act of sexual penetration. We disagree.

In sex offense cases, court of review are required to examine the evidence carefully and in order to sustain a conviction for criminal sexual assault, there must be evidence that defendant committed an act of sexual penetration by the use of force or threat of force. (*People v. Walker* (1987), 154 Ill. App. 3d 616, 621, 506 N.E.2d 1004, 1007; Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1).) The statutory definition of "force or threat of force" is "the use of force or violence, or threat of force or violence." (Ill. Rev. Stat. 1987, ch. 38, par. 12—12(d).) In addition, in order to sustain a conviction for sexual assault, the testimony of the victim must be clear and convincing, or corroborated by some other facts and evidence. (*People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 1024, 486 N.E.2d 1297, 1301.) The credibility of the complainant is an issue best determined by the trier of fact, who heard the testimony and observed the demeanor of the witnesses. (*People v. Watts* (1985), 139 Ill. App. 3d 837, 851, 487 N.E.2d 1077, 1087.) The facts of each case must be considered in determining whether defendant intentionally had intercourse with complainant against her will. (*People v. Houck* (1977), 50 Ill. App. 3d 274, 281, 365 N.E.2d 576, 581.) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of evidence or credibility of the witnesses, and may not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of guilt. *People v. Nelson* (1986), 148 Ill. App. 3d 811, 821, 499 N.E.2d 1055, 1062.

In the present case, the victim testified that defendant initially placed one of his arms around her neck and the other in her back and stated, "[Y]ou are going to give me some pussy." When Mitzi refused, defendant pushed, slapped, choked, bit, and wrestled with her before he was able to subdue her. Mitzi further testified that when she was

able to reach the front door and scream for help, defendant grabbed her by her hair and dragged her back to the bedroom. Once they were inside the bedroom, Mitzi continued to struggle with defendant in an attempt to keep him from closing the door. In addition, defendant removed a pillowcase from a pillow and threatened to choke Mitzi with it. Mitzi promised she would not tell anyone if defendant would allow her to live. The injury to Mitzi's finger which required two stitches to repair is further evidence of defendant's use of force to sexually assault her.

The victim's lack of consent to participation in sexual intercourse was further evidenced by her knocking down in an unguarded moment in order to flee from the apartment. Also, defendant's own pretrial statement and trial testimony revealed that defendant admitted that (1) he grabbed the victim around the shoulder and asked her for sex while they were in the hallway of the apartment; (2) the victim tried to get out of his grasp; (3) he and the victim struggled on the bedroom floor; (4) the victim told him that it did not have to be that way; (5) he told the victim that he would kill himself; (6) the victim asked him if he was going to kill her; (7) he apologized to the victim; and (8) the acts of sexual penetration occurred.

The testimony of the victim was both clear and convincing and corroborated by the victim's injuries, pictures of the crime scene which showed bloodstains on the bed where the victim was sexually assaulted, and defendant's own pretrial and trial statements. In addition, the court specifically found that the victim was more credible than defendant. In so finding, the court stated:

> "[The] whole question is consent. As to every other single aspect of the case, there is complete corroboration, there is very little difference between her statement and his in the basic sense ***. I think the defendant had intercourse with her against her will, I'm going to find him guilty ***."

After a review of the record, we cannot say that the totality of the evidence of force and resistance was so unsatisfactory as to leave a reasonable doubt that sexual intercourse was accomplished against the victim's will. We find the victim's testimony regarding the use of force to be both clear and convincing and substantially corroborated.

Accordingly, the judgment and sentence of the circuit court is affirmed.

Affirmed.

WHITE and CERDA, JJ., concur.