THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH HIGGINS, Defendant-Appellant.

Second District   No. 78-3

Opinion filed April 23, 1979.

Robert E. Cronin, of Chicago, for appellant.

John W. Cox, Jr., State's Attorney, of Galena (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE NASH delivered the opinion of the court:

Defendant, Keith Higgins, was found guilty after trial by jury of taking indecent liberties with a child (Ill. Rev. Stat. 1975, ch. 38, par. 11—4(a)(3)) and sentenced to a term of four to eight years in the penitentiary. He appeals, contending the evidence was insufficient to establish his guilt beyond a reasonable doubt and that prejudicial error occurred during trial of the case.

The principal witness for the State was Johnny, who was 10 years old at the time of the alleged offense. He testified that with his parents' permission he had spent several weekends with defendant, a minister of the Methodist church, at its parsonage in Apple River. As his parents worked long hours operating a grocery store in Scales Mound, defendant took him to movies, museums and other places for which they did not

have time. Defendant also tutored the boy in reading and assisted him with a communication difficulty.

Johnny testified he spent the day of March 28, 1976, at defendant's home and that early on that Sunday evening he and defendant watched television in the bedroom and while doing so lay on the bed with their tee shirts rolled up and their stomachs touching. Also present at this time watching television were Nicky, Melissa and Marney Dayo and another boy whose name he did not recall. He testified further that Marney left and later returned with her mother, Mrs. Helen Dayo, and that he and defendant were still on the bed when she came into the room. Mrs. Dayo said nothing about them being on the bed, although they were still touching stomachs, but did yell at defendant for permitting the children to telephone her at The Friendly Tap pretending to call from Higgins Pizza Parlour. When the television show was over at 8 p.m. she took her children and left. Johnny testified the defendant came to his room later that night after he had gone to bed and rolled his fingers over the boy's penis for about an hour; neither he nor defendant said anything during this time. Johnny further testified that similar acts had occurred on one or two other occasions. He said nothing to his parents or anyone else about these matters for several weeks and when asked in late May 1976 if these acts had occurred, he denied it. On June 3, however, after having told both his parents and investigating officers that no improper conduct had occurred between himself and defendant, he changed his story and stated defendant had committed the act and gave a written statement in which he asserted it took place on May 22, 1976. The confusion as to the date of the offense was subsequently cleared up in Johnny's mind, he testified, after a meeting with Helen Dayo and others at her home when they all looked at church bulletins and reminisced and came up with the correct date of March 28, 1976.

Helen Dayo testified that on March 28 her six-year-old daughter Marney came home after having been at defendant's house and she then returned to the parsonage with Marney to bring her other two children home for supper. Upon arriving they were let in by her eight-year-old son Nicky and went upstairs where she saw her 10-year-old daughter Melissa, a boy named Billy Reisbeck, Johnny and defendant watching television. She testified she saw "Reverend Higgins and Johnny laying on the bed wrapped around each other with their shirts up." She stated she discussed the television program with defendant and returned home with her children. While she testified she was shocked by what she had seen she said nothing to anyone about it for about two months until the end of May when she told Johnny's mother. She testified she also told her about times defendant had hypnotized Johnny and times he had given children things to drink.

Johnny and Helen Dayo were the only witnesses called by the State to testify directly relating to the offense in question. None of the three Dayo children or Billy Reisbeck, who had been present on the evening of March 28, were called to testify in the trial of this cause.

The first complaint in this case came on May 26, 1976, when Helen Dayo went to the sheriff and stated that defendant had taken indecent liberties with Johnny. In a written statement given to officers on May 27 she stated the incident occurred "about a month ago," or about April 27, and at trial testified it had in fact occurred March 28. After her complaint, Johnny was questioned by his parents and denied that any such acts had occurred at any time. After learning that he and his mother would not be going on a planned trip to Ohio with defendant and other children, Johnny changed his story and agreed the acts had taken place.

Phillip Shere, aged 18, and Don Buckwalder, aged 17, were called by the defense and testified they were foster children of defendant who had been placed in his home by the Illinois Department of Children and Family Services. They stated that while Johnny did stay overnight in the parsonage on several occasions he did not do so on Sunday, March 28, 1976. Both boys testified they never saw anything unusual happen between defendant and Johnny and recalled the March 28 occasion in which Mrs. Dayo had come to the home for her children and testified that shortly after 8 p.m. on that evening defendant had taken Johnny back to his home. James D. Quick, a caseworker for the Department of Children and Family Services, testified he was in touch with Shere and Buckwalder twice a week while they stayed with defendant and nothing unusual had ever been reported to him. Donald Olson, a member of the board of defendant's church and custodian of the building, testified his five young children often went to the parsonage and played with other children there without incident. An inquiry made to this witness by defendant's counsel whether he had personal knowledge of problems existing between defendant and Helen Dayo was objected to by the State and sustained by the trial court as not relevant.

Except for several character witnesses, defendant was the only other person called to testify for the defense. He stated that shortly after becoming pastor of this church in June 1974 Helen Dayo, then a church school teacher, commenced coming to the parsonage to speak to him. He said she "made a pass" at him in the presence of her brother and sister-in-law, Mr. and Mrs. James Upman, at a time when she had been drinking, and wanted to talk to him about her marital difficulties and to spend the night in defendant's house. He testified she had to be physically removed from the premises. Defendant later explained what had occurred to her husband and advised that they see a counselor. In April 1976, defendant testified, Mrs. Dayo came to his home with her children and said that her

husband was drinking and she was leaving him. He told her he did not want to know where she was going but that about two or three o'clock the next morning her husband arrived with a deputy sheriff and pounded a hole in the parsonage door insisting his wife was there.

With reference to Sunday, March 28, defendant testified that his foster sons, Don and Phil, together with Johnny, who had stayed over Saturday night, attended Sunday school and church services and on that afternoon defendant visited a friend in the Darlington Hospital. He testified he returned home about 4:30 p.m. with pizza for their dinner and found the three Dayo children were also at his home. He stated the several children watched television on the color set in his room until about 5:30 p.m. when he joined them. He called Helen Dayo, locating her at a bar, because he objected to feeding her children and requested that she come to get them. She subsequently did come over and came up to the room where he and the children were watching television and soon left with her children. Defendant testified that he and the three boys ate a pizza dinner while watching a television special and he took Johnny home shortly after 8 p.m.

Defendant testified that on May 26 Mrs. Dayo became upset with him because he had intended to take Johnny to Ohio for a trip, with other children, as he had promised the boy if he raised his grades, but was not taking Melissa Dayo, who also wished to go. Mrs. Dayo told him that if Melissa could not go she would tell his mother that Johnny should not go and stormed out of the house. Later that night, at about 11:30 p.m., the sheriff informed defendant Mrs. Dayo had accused him of taking indecent liberties with her son Nicky and that she suspected he had also done so with Johnny. Defendant denied the accusations but was thereafter arrested on June 7.

Neither the three Dayo children nor Billy Reisbeck was called to testify in trial nor did the State choose to call Helen Dayo or any other witness in rebuttal to defendant's testimony.

Defendant's principal contention on appeal is that the evidence submitted against him was not clear, convincing or substantially corroborated and that it leaves a reasonable doubt of his guilt. We agree and must reverse.

■■ It is a well-established rule that where the conviction for taking indecent liberties is based upon the testimony of a child, to be sustained the evidence must be substantially corroborated or be otherwise clear and convincing. *People v. Morgan* (1977), 69 Ill. 2d 200, 206, 370 N.E.2d 1063, 1066; *People v. Williams* (1953), 414 Ill. 414, 111 N.E.2d 343.

The testimony of the 10-year-old boy in this case falls short of being clear and convincing and the only corroboration of it offered by the State was Helen Dayo's account of an alleged earlier stomach touching

incident. If Helen Dayo witnessed an earlier lewd encounter between defendant and Johnny then so too must have her three children and Billy Reisbeck, all of whom were present in the room watching television with defendant and Johnny when that conduct was said to have occurred. None of these children were called to testify in the trial of the case. It is also noteworthy that Mrs. Dayo did not see fit to disclose the scene she allegedly witnessed to Johnny's parents or to the authorities until some two months later, after having a dispute with defendant. The defendant's testimony, in which he described personal difficulties he had earlier experienced with Mrs. Dayo, stands unrebutted. He testified that Mr. and Mrs. James Upman were present when he turned aside a "pass" made by Mrs. Dayo and that he later informed her husband of her conduct. The Upmans were not called to deny this testimony which tended to show that some animosity toward defendant on the part of Mrs. Dayo could be present and affect her credibility.

Johnny, the unfortunate center of this matter, was questioned about the complaint made to the sheriff by Mrs. Dayo and at first denied any improper conduct towards him by defendant. Several days later, after further questioning, he said the acts had occurred but was uncertain as to the date. It was only after subsequent reminiscing at meetings with his parents at Mrs. Dayo's home that Johnny settled upon the March 28, 1976, date. Johnny's testimony that he had stayed overnight at defendant's home on that Sunday was disputed by the two older boys who lived with defendant who testified Johnny had been returned to his home shortly after 8 o'clock that evening. They also denied any knowledge of improper conduct on the part of defendant.

As our supreme court said in *People v. Watkins* (1950), 405 Ill. 454, 457, 91 N.E.2d 406, 407, a charge of taking indecent liberties with a child "is an accusation easily made, hard to be proved, and harder to be defended by the party accused, though ever so innocent. [Citation.] We have always safeguarded the interests of an accused where the testimony is uncorroborated, by requiring that it should be clear and convincing." See *People v. Bryant* (1970), 123 Ill. App. 2d 35, 259 N.E.2d 638; *People v. Pazell* (1948), 399 Ill. 462, 78 N.E.2d 212.

■■■ We are fully aware of the inherent difficulties in obtaining proof in cases of this nature where the witnesses are immature and the conduct hidden. Nevertheless, the requirement that a defendant be proved guilty beyond a reasonable doubt remains. (*People v. Kolden* (1962), 25 Ill. 2d 327, 330, 185 N.E.2d 170, 172.) We have carefully reviewed the evidence in this case and find it is insufficient to remove all reasonable doubt of defendant's guilt and to create an abiding conviction that he is guilty. *People v. Hister* (1975), 60 Ill. 2d 567, 573, 328 N.E.2d 531, 534.

As the judgment of conviction in this case must be reversed on the

grounds we have discussed, we need not consider the further claims of trial error advanced by defendant.

Reversed.

LINDBERG and SEIDENFELD, JJ., concur.