THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT DEAN MERIDETH, Defendant-Appellant.

Second District   No. 2—85—0931

Opinion filed January 30, 1987.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Robert J. Biderman and Rebecca L. White, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Robert Dean Merideth, was charged by indictment in the circuit court of Kane County with the offense of aggravated criminal sexual abuse. (Ill. Rev. Stat. 1985, ch. 38, par. 12—16(c)(1).) He was found guilty of that offense by a jury and sentenced to 3 years' probation subject to various conditions, including 6 months' imprisonment in the county jail and 12 months' intensive probation supervision.

Prior to defendant's trial, the four-year-old complaining witness, M.M., was examined in chambers and determined by the court not to be competent to testify. The cause proceeded to jury trial, and Penny

Oswood took the stand. She had been just one month short of her 14th birthday on May 11, 1985, the date the incident in question occurred. In the early morning on that date, she was baby-sitting for the complainant at complainant's home in Aurora. The house was located less than one block from the Krug School in Montgomery, a village which borders Aurora. Early in the morning, between 9 and 9:30 a.m., Penny and M.M. went to the Krug School park. M.M. went to the tire swing, and Penny sat on a wooden swing ladder. After about one-half hour, a man wearing old blue jeans, work boots, and a tan jacket approached. He was carrying a red umbrella and a pouch with a shoulder strap. He appeared to be in his late thirties or early forties and had grey hair. He began talking to M.M., who was 2 to 4 feet away from Penny. Penny was keeping an eye on the little girl and on M.M.'s house to check to see if M.M.'s father had come home. Penny identified the man in court as the defendant. At one point, M.M. went to the garbage can to throw away a piece of glass. She tripped on the way back, and the defendant helped her up. The two of them then began talking. Next, Penny saw M.M. step back and heard her say, "No." The defendant was sitting on a log with the little girl 1 foot in front of him. Defendant left a few minutes later. About five minutes later, M.M. came over to Penny; she was crying and very upset. When Penny asked her what the defendant had said to her, she said that he said, "Hi," and that he had touched her "pee-pee."

Penny picked her up and ran to M.M.'s house where she called her own mother in Boulder Hill. Before Penny's mother arrived, Penny had M.M. demonstrate on a doll what the defendant had done to her. Over defendant's objection, Penny testified M.M. ran her hand up between the doll's legs. M.M. was still very much upset at that point, but was slowly calming down. Penny's mother arrived, and, after she got M.M. to calm down some more, the demonstration was repeated for Penny's mother. Penny's mother then phoned M.M.'s mother, who requested that the police be called.

On cross-examination, Penny testified that M.M. was talking with the man about a total of 10 minutes, during which time Penny glanced at M.M.'s house about four or five times. In addition to seeing the defendant touch M.M. when he helped her up, Penny testified she saw him touch her arm. She heard some of their conversation, which was about where they lived and about the defendant's watch. About two minutes passed between the time the defendant helped M.M. up to the time she saw M.M. step back and say, "No." Penny did not observe anything out of the ordinary during that time. After she said, "No," M.M. was standing back from the defendant like she

was "sort of mad." The defendant left then, and Penny got up and moved away from where M.M. was toward the swings, and M.M. came running to her, crying. Penny asked her, "What did the man say?", and she said he said, "Hi," and when Penny asked her, "What did he do?", M.M. said, "He touched my pee-pee."

Montgomery police officer Caho testified that at the time the defendant was booked, he stated he was 49 years old. Caho also testified that M.M.'s house is on the same block as the Krug School, and that the address given by the defendant was located less than half a block away from the school. The trial was then adjourned until the following day, at which time the trial court again conducted a hearing for a current ruling on M.M.'s competency to testify. The court found she was still not competent to testify.

Montgomery police officer Roy Gustafson was on duty May 11, 1985, and was dispatched to a house bordering the Krug School shortly after 10 a.m. Penny Oswood, her mother, and a three-to-four-year old child, M.M., were present. The child was very nervous and scared. Gustafson let her play with his handcuffs and pen in order to gain her confidence. He asked if a man had been "naughty" to her, and she responded, "Yes." He asked if he had touched her, and, after a few minutes, she nodded in the affirmative. He gave her one of the dolls which was in the living room, and he asked her to relate to him where the man had touched her. She rubbed her hand on the doll's leg and then took two fingers and went to the vaginal area. He pointed to where she had indicated and asked, "Is this where the man touched you?", and she said, "Yes, pee-pee."

Gustafson dispatched a description of the suspect: white male, forties, greyish-white hair, black-and-silver rimmed glasses, tan coat, pouch with shoulder strap, red umbrella, laced work shoes, and blue jeans. Gustafson then left the house and began to search for the man. About one block from Krug School, he found a man who matched the description and conversed with him. He identified the defendant in court as the man with whom he spoke on the street. The officer asked if the defendant had seen someone in the area that matched his description, and the defendant acknowledged that he had walked through the school yard earlier and had spoken to two young girls. Defendant was later arrested.

On cross-examination, Gustafson testified he was wearing a blue uniform, a badge, a gun, "numchucks" (two sticks connected with a chain normally used in karate/martial arts), and a radio, but no hat. He talked with Penny and her mother before he talked with M.M., and they were all present while he talked with M.M. M.M. would not

look at his face for several minutes and looked away when she responded affirmatively to his first question about the man being naughty to her. At that time she either said, "Yes," or shook her head indicating in the affirmative. It was after that that he let her play with his handcuffs and pen, and she responded affirmatively but nonverbally to his second question about being touched. The use of the doll is a technique used with young children because it makes them more comfortable. He did not qualify his request to her, "Tell me where you were touched," with the phrase, "if anywhere."

Ruth M., M.M.'s mother, related that she lived in Aurora and that M.M. was almost four years old at the time of trial. On May 11, 1985, she picked up Penny Oswood, her babysitter, about 7:30 a.m. and went to work. Penny's mother phoned later that morning, about 10 o'clock, while she was on her break. At about 5 o'clock that evening, Ruth was alone with M.M. and had a conversation with her. Over defendant's objection that statements made seven hours after the incident are irrelevant, Ruth was permitted to testify that M.M. was quiet and more subdued than usual at the time they talked. Over continuing objection, Ruth testified as follows:

"When I talked to [M.M.], I asked her what happened while she was in the park that day, and she told me that she didn't want to; and I asked her why, and she told me because the man told her not to; and I pointed out to her that she had talked to Penny and had talked to the policeman earlier that day about it. And it took some convincing on my part for her to even want to talk to me about it.

And I asked her what happened, and she said—she says, 'The man showed me his watch, talked about his watch.' And she at the time said he asked her if she could read, and she told him no, she couldn't read. And then she—let's see.

She says, 'Then he touched me.' And I says, 'Well, where did he touch you?' And she didn't use words. She just brushed her hand quickly across her vaginal area."

Ruth testified that M.M. had never made such a report before.

On cross-examination, Ruth testified she asked Penny and her mother to take M.M. to their house. She left work a little before 2 p.m., and between that time and 5 p.m., she went to the Oswood's residence where she and Penny and her mother talked about the incident. M.M. was outside playing at that time, but was in and out of the house during that discussion. M.M. was not examined by a physician.

After the State rested, defense counsel made a motion for a di-

rected verdict which was denied. The defense then rested. As noted, the jury returned a verdict of guilty of the offense of aggravated criminal sexual abuse.

Defendant's first contention is that he was not proved guilty beyond a reasonable doubt where, although not conceding the admissibility of M.M.'s hearsay declarations, her declarations, when treated as testimony, were uncorroborated and unconvincing. He notes that evidence in a case such as this must be substantially corroborated or otherwise clear and convincing (*People v. Higgins* (1979), 71 Ill. App. 3d 683) and argues his mere presence at the scene of the incident is not sufficient to prove such corroboration. He points to the fact that even though Penny Oswood testified she saw M.M. step back when she said, "No," and, thus, must have had M.M. in view, she observed nothing. Moreover, he argues Oswood's subsequent conduct in walking farther away from where M.M. was, toward the swings, is inconsistent with the claim that M.M.'s "No" was in rebuff of a sexual advance. Finally, relying on *In re Custody of Brunken* (1985), 139 Ill. App. 3d 232, he argues that because evidence of the type adduced below has been found insufficient as a matter of law to sustain an adjudication of wardship where proof by a preponderance of the evidence is required, such evidence could not possibly be sufficient to sustain the defendant's guilt where the higher standard of proof beyond a reasonable doubt is required.

In concurrence with the quality of evidence that must be adduced in a case such as this, the State maintains that M.M.'s declarations were both clear and convincing and corroborated and that *In re Custody of Brunken* (1985), 139 Ill. App. 3d 232, is distinguishable. We agree.

As the State notes, M.M, who was crying and upset, promptly complained of the incident to her baby-sitter, Penny, and demonstrated on a doll for Penny and Penny's mother where the defendant had touched her. Shortly thereafter, for Officer Gustafson, in innocent and startling precise detail, she reenacted on the same doll the defendant's two-fingered movement, all the while averting her eyes from the officer's face. As if such guileless openness would fail to convince, later, for her mother, with considerable hesitancy, she quickly rubbed her hand across her own vaginal area in an abstract rendition of where the defendant had touched her.

We find remarkably convincing the unwavering consistency of the report of such a young victim given over the course of seven hours' time to four different people, at least one of whom (the police officer) was a perfect stranger attired in unfamiliar clothing with dangerous-

looking "accessories."

We do not find inconsistent Penny's moving toward the swings, farther away from M.M., after M.M. said "No," since the defendant was still present at that time and M.M. did not begin crying until after the defendant left. Moreover, the defendant and M.M. were still within easy view of Penny. The evidence also showed there was a two-minute period of time during which the defendant conversed with M.M. while she was standing about 1 foot away in front of him. Penny could hear part of their conversation, and, at the same time, she was glancing periodically in the direction of M.M.'s house. Thus, the defendant had the opportunity, albeit brief, to abuse M.M. Penny could easily have missed observing what was likely a rather quick and stealthy movement by the defendant and still have heard and observed M.M.'s reaction to it.

We find the evidence offered in *In re Custody of Brunken* (1985), 139 Ill. App. 3d 232, distinguishable. As the State notes, in *Brunken*, as here, the sexually abused minor did not testify, but out-of-court statements made by her to four individuals at various times over a period of nearly a year were admitted as evidence. Because the hearsay statements offered in *Brunken* were uncorroborated, such as by way of prompt complaint or by admissions of the accused, the court found that they were insufficient by themselves to support a finding of abuse or neglect under section 4—6(4)(c) of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 704—6(4)(c)). Although we agree *Brunken* is distinguishable, we must reject the State's argument that the distinction is that here there was a "prompt complaint" so "[M.M.'s] testimony *** was corroborated."

■ Although the admissibility of a prompt complaint does not generally extend to crimes other than rape, under section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10), a complaint involving a child under the age of 13 concerning criminal sexual assault or criminal sexual abuse, and the aggravated forms of those offenses (Ill. Rev. Stat. 1985, ch. 38, pars. 12—13 through 12—16), is specifically admissible through testimony by the child and testimony by a person to whom the child complained that the complaint was made in order to corroborate the child's testimony. However, M.M. did not testify here, having been found incompetent to do so, and since proof of such complaint is admissible only on the theory that it tends to corroborate the testimony of the prosecuting witness, proof of her complaint was inadmissible on the basis that it was a corroborative complaint. *People v. Damen* (1963), 28 Ill. 2d 464, 473; *People v. Furlong* (1945), 392 Ill. 247, 250; *People v. Sa-*

*las* (1985), 138 Ill. App. 3d 48, 56.

The instant cause is nevertheless distinguished from *Brunken* on the basis that M.M.'s statement to Penny in the park fell within the spontaneous-declaration exception to the hearsay rule and, thus, was admissible and sufficient to sustain the defendant's conviction. In order for a statement to fall within this exception, there must have been (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) absence of time to fabricate, and (3) a statement which relates to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 181.) The contents of a spontaneous declaration may be shown *in toto* (*People v. Damen* (1963), 28 Ill. 2d 464, 474), and, of particular note here, a spontaneous declaration is admissible despite the fact that the declarant is a child and is incompetent as a witness for that reason (McCormick, Evidence sec. 297, at 708 (2d ed. 1972)). Accordingly, we find the instant cause amply distinguished from *Brunken*.

Lastly, we find there was sufficient evidence to prove that the defendant's contact with M.M. was intentional, not accidental, by virtue of M.M.'s mother's testimony that M.M. told her the defendant told her not to tell about the incident. The evidence shows the defendant did not leave the park immediately upon M.M.'s rebuff, and the reasonable inference arises that the topic of their continued conversation was this admonition to M.M. It also may be reasonably inferred that the defendant told her in particular not to tell her mother since M.M. expressed this prohibition only to her mother.

In sum, we find the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt.

Next, we examine in more depth the defendant's contention that M.M.'s statements and demonstrations to Penny Oswood, Officer Gustafson, and M.M.'s mother were not admissible as excited utterances. Defendant's contention here is based on the argument that there was no predicate showing made that a startling event occurred. Defendant states that M.M.'s out-of-court statements are not self-validating; that is, there must be some independent evidence that the statements were the product of a startling event. In support of his position he relies primarily on *People v. Leonard* (1980), 83 Ill. 2d 411, and *People v. Coleman* (1983), 116 Ill. App. 3d 28.

The State acknowledges that because M.M. did not testify, her statements to these witnesses were not admissible as corroborative complaints under the provisions of section 115—10 of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 115—10). Accordingly, unless her statements fall within the spontaneous-declaration exception to the hearsay

rule, they were inadmissible. The State argues that the statements did fall within that exception and that there was evidence a startling event occurred. It contends that, given M.M.'s tender age and inexperience, the defendant's action in molesting her vaginal area was a startling occurrence and that her statements and demonstrations to these witnesses were properly admitted. It also distinguishes the cases cited by the defendant in support of his position.

The three requirements which must be met before evidence may be said to fall within the "excited utterance" or "spontaneous declaration" exception to the hearsay rule were set forth in the discussion above and were derived from *People v. Poland* (1961), 22 Ill. 2d 175, 181. The exception is premised on the notion that the excitement caused by the event or condition temporarily stills the capacity for reflection, thus producing statements free of conscious fabrication. (*People v. Pointer* (1981), 93 Ill. App. 3d 1064.) Although it has been noted that "[u]nder generally prevailing practice, the declaration itself is taken as sufficient proof of the exciting event and therefore the declaration is admissible despite absence of other proof that an exciting event occurred" (McCormick, Evidence sec. 297, at 705 (2d ed. 1972)), the court in *People v. Leonard* (1980), 83 Ill. 2d 411, 418, stated:

"[A]bsent some evidence of the existence of an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, the testimony relating the out-of-court statement should be excluded."

Direct proof of such shocking event is not strictly necessary, however, since the *Leonard* court found there was sufficient circumstantial evidence to corroborate the existence of an occurrence sufficiently startling to produce a spontaneous and unreflecting statement.

In that case, and contrary to the State's argument here, the court found the decedent's statement, "He's got a gun," *was* corroborated by circumstantial evidence; that is, by the testimony of three witnesses who witnessed the nearly contemporaneous struggle over the weapon. That result was in accord with earlier cases which held that the event was satisfactorily proved if there were circumstances consistent with it having happened, plus a recital of it in the declaration itself. See *People v. Poland* (1961), 22 Ill. 2d 175; *Morris v. Central West Casualty Co.* (1932), 351 Ill. 40; *People v. Cherry* (1980), 88 Ill. App. 3d 1048.

The absence of even any circumstantial evidence that a startling event had occurred required a reversal in *People v. Coleman* (1983), 116 Ill. App. 3d 28, which is relied on by the defendant here. We find

the instant cause distinguished from *Coleman* on its facts, however, which clearly show that here there were "circumstances consistent with it having happened." Specifically, Penny Oswood testified she observed the defendant and M.M. conversing and that M.M. was standing about 1 foot away, in front of the defendant, who was seated on a log. Certainly the juxtaposition of the defendant and M.M. was conducive to the conduct alleged. Penny testified she heard M.M. say, "No" and saw her step back away from the defendant. She said that M.M. was standing back from the defendant like she was "sort of mad." After hearing M.M. say, "No," Penny moved over by the swings, and the defendant got up and left the park. About five minutes later, M.M. ran over to Penny; she was crying and very upset and made the statement in question, which recited what happened. We find these circumstances are consistent with the abuse having occurred, and, consequently, we find that there was evidence that a startling event occurred.

■ Defendant next contends that M.M.'s statements to Penny Oswood and Officer Gustafson were inadmissible because the spontaneous nature essential to their admissibility was destroyed by their questioning of M.M. He argues that, unlike the open-ended question, "What happened?" in *People v. Damen* (1963), 28 Ill. 2d 464, Oswood and Gustafson's questions to M.M. were leading, suggestive inquiries.

The State asserts the defendant has waived this issue by failing to raise it in his post-trial motion. We agree and note additionally that no objection on this basis was made during trial. Accordingly, the issue has been waived. *People v. Lucas* (1981), 88 Ill. 2d 245; *People v. Howard* (1985), 139 Ill. App. 3d 755; *People v. Chatman* (1982), 110 Ill. App. 3d 19.

When a claim of error has not been properly preserved, issues relating to admissibility of hearsay testimony will not be considered as grounds for reversal on appeal except where the plain-error doctrine set forth in Supreme Court Rule 615(a) is applicable. (87 Ill. 2d R. 615(a); *People v. Coleman* (1980), 83 Ill. App. 3d 429.) The doctrine of plain error is a limited exception, not a general savings provision, and may be invoked in criminal cases where the evidence is closely balanced or where the error was of such magnitude that the accused was denied a fair trial. *People v. McNutt* (1986), 146 Ill. App. 3d 357, 364.

■ Clearly, the evidence here is not closely balanced, nor do we find the error of such magnitude as to have denied the defendant a fair trial. When hearsay testimony is admitted into evidence without objection, it may properly be considered and will be given its natural probative effect. (*People v. Lewis* (1974), 20 Ill. App. 3d 161.) Any er-

ror involved in the admission of hearsay testimony is harmless where the testimony is merely cumulative or is supported by positive identification and other corroborative circumstances. *People v. Mosley* (1979), 71 Ill. App. 3d 808.

The defendant argues that even assuming the admissibility of M.M.'s complaint to Penny Oswood at the playground, the admission of the testimony was not harmless since people tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony it might not otherwise deserve. In support, he cites *People v. Smith* (1985), 139 Ill. App. 3d 21.

*Smith*, however, involved the improper bolstering of a witness' testimony with evidence of a statement made by the witness out of court which harmonized with his in-court testimony. The court found that the admission of a statement used to bolster the sagging credibility of a witness is reversible error when the witness' in-court testimony is crucial. (*People v. Smith* (1985), 139 Ill. App. 3d. 21, 34.) In the instant cause, there is no question of "sagging credibility" of a witness which was improperly bolstered by the hearsay evidence; the reliability, and, therefore, admissibility, of a spontaneous declaration comes not from the reliability of the declarant, but from the circumstances under which the statement is made. *People v. Cherry* (1980), 88 Ill. App. 3d 1048, 1052.

▪ It is true that one of the circumstances to be taken into account is whether the statement made was volunteered or was in response to a question. The spontaneity of statements made in response to questions has been upheld in cases such as *People v. Damen* (1963), 28 Ill. 2d 464 ("What happened?"), *People v. Sanchez* (1982), 105 Ill. App. 3d 488 ("Who did this to you?"), and *People v. Webb* (1984), 125 Ill. App. 3d 924 ("John, do you know who shot you?"). As the State notes, in *People v. Watson* (1982), 107 Ill. App. 3d 691, the defendant was convicted of indecent liberties with a child. He testified at trial that his three-year-old daughter must have injured herself by falling on a rocking chair. He contended it was error for the court to allow the two emergency-room nurses to testify to statements made by the girl in response to a series of questions regarding the rocking chair. Among other responses, the girl stated that she did not fall on the rocking chair. No reversible error was found, however, since the court viewed that there was little time for fabrication, the event was sufficiently startling to produce a spontaneous statement, and the statements related to the circumstances of the occurrence. The court also noted that the credibility of a child of such tender years was a matter for the jury to weigh.

Although the questions posed here to M.M. were more extensive than those in *Damen, Sanchez,* and *Webb,* they were no more probing than those in *Watson,* and the statements to Oswood and Gustafson both occurred within a half hour of the time of the incident and M.M. was still very upset. We note here that the court in *In re Marriage of Theis* (1984), 121 Ill. App. 3d 1092, 1097, identified a trend toward a general liberalization of the spontaneous-declaration exception in its application to the statements of children of tender years. The court also noted that the fact a statement was made in response to detailed inquiries which probed for the existence of specific criminal activity did not necessarily destroy the unreflective or spontaneous character of the statement. (121 Ill. App. 3d 1092, 1097; *People v. Grover* (1983), 116 Ill. App. 3d 116.) The underlying rationale for this liberalization appears to be that it is unlikely that a child of tender years will have any reason to fabricate stories of attacks. See, *e.g., People v. Chatman* (1982), 110 Ill. App. 3d 19, 27; *People v. Cherry* (1980), 88 Ill. App. 3d 1048, 1055; *People v. Miller* (1978), 58 Ill. App. 3d 156, 161.

For the reasons expressed above, we find defendant has waived the error by failing to properly preserve it and that no plain error occurred on the basis asserted which requires reversal.

■ Defendant next contends that Ruth M.'s testimony relating M.M.'s statements was inadmissible upon the additional ground that a substantial period of time elapsed between the alleged occurrence and the statement. He argues that between the time of the incident and the time Ruth spoke with M.M., 7½ hours had elapsed. Also, between the hours of approximately 2 and 5 p.m., M.M. was playing outdoors, and when she talked with her mother she was "quiet" and "a little more subdued than normal." Thus, he argues, M.M.'s excited state had dissipated.

Although elapsed time is material in determining spontaneity, it is not controlling, and a court must determine from the entirety of the surrounding circumstances whether there was opportunity for reflection and invention. (*People v. Davis* (1984), 130 Ill. App. 3d 41, 55-56; *People v. Smith* (1984), 127 Ill. App. 3d 622, 628.) One circumstance to be considered is the declarant's mental state at the time of the statement. (127 Ill. App. 3d 622, 628.) Other factors to be considered include the nature of the event, the influence of intervening occurrences, and the presence or absence of self-interest. (*People v. Parisie* (1972), 5 Ill. App. 3d 1009.) A critical factor is the lack of opportunity to fabricate. *People v. McNichols* (1986), 139 Ill. App. 3d 947, 955.

The defendant relies on *People v. Van Scyoc* (1982), 108 Ill. App.

3d 339, a case in which the defendant was convicted of aggravated battery based upon testimony relating that the victim's siblings stated the defendant " 'kept throwing [Laura] [the victim] in the water.' " (108 Ill. App. 3d 339, 341.) The conviction there was reversed on the basis the statements were not spontaneous declarations where they were made three to four hours after the event and where for a substantial period of time the declarants were not upset or still startled from the event purportedly witnessed by them. The State relies on *People v. Robinson* (1981), 94 Ill. App. 3d 304, a case in which a six-year-old girl was sexually attacked by her cousin in the afternoon. Although she was with her mother later that night, she said nothing about the incident until the next morning. The court there found the 16-hour delay in telling her mother did not destroy the admissibility of the statement as a spontaneous declaration.

We note various shorter and even longer time lapses have been held not to defeat admissibility of a statement made by a child of tender years as a spontaneous declaration. Cf. *People v. McNichols* (1986), 139 Ill. App. 3d 947 (five-year-old boy and at least four-hour time lapse where incident occurred during the night, mother held victim "most of the rest of the night," finally putting him to bed about 5 a.m., and declaration was not made until about 9 a.m.); *In re Marriage of Theis* (1984), 121 Ill. App. 3d 1092 (three-year-old victim and two-month time lapse between alleged abuse and victim's statements to doctor investigating cause of vaginal discharge); *People v. Chatman* (1982), 110 Ill. App. 3d 19 (four-year-old boy's statement made 18 hours after seeing his father shot).

Based on the entirety of the circumstances shown by the evidence here, we find that although there certainly was an opportunity for reflection and invention between the time of the incident and the time M.M. made the statement to her mother, we believe the likelihood that M.M. fabricated the statement to her mother was slight to nonexistent. Even the *Van Scyoc* court recognized that the victim of a crime, as opposed to a witness, is more likely to remain startled for a longer period of time, and that children of tender years are less likely to fabricate than older persons. (*People v. Van Scyoc* (1982), 108 Ill. App. 3d 339, 342.) We find cogent the view expressed in *In re Marriage of Theis* (1984), 121 Ill. App. 3d 1092, that child-abuse cases demand an even greater respect for the reliability of the child's statements. Although we acknowledge that *Theis* involved a civil proceeding to restrict the appellee's visitation rights with his daughter (whom he allegedly had abused) and his son, we perceive no reason to view the reliability of children involved in a criminal proceed-

ing in any different light. The *Theis* court stated:

> "In child-abuse cases, Wisconsin courts have long recognized that a broad and liberal interpretation should be given to what constitutes a spontaneous declaration when applied to young children. [Citation.] The Wisconsin courts have noted that the stress of the event will remain with the child long after it occurred and that the child's statements will be unfabricated for three reasons. First, a child is apt to repress the incident. Second, it is often unlikely that a child will report this kind of highly stressful incident to anyone but the mother. Third, the characteristics of young children work to produce declarations free of conscious fabrication for a longer period after the incident than adults. It is unlikely a young child will review the incident and calculate the effect of the statement. [Citation.]" 121 Ill. App. 3d 1092, 1098.

■ In the instant cause, the first opportunity at which M.M. and her mother were alone, the mother inquired what happened in the park. M.M. was quiet and "more subdued than usual." For the first time, M.M. stated she could not tell because the defendant told her not to. When her mother reminded her that she had already told Penny and Officer Gustafson, M.M. first related several of the innocuous details of her encounter with the defendant before she stated that the defendant had touched her. When asked where the defendant had touched her, she did not speak, but only moved her hand quickly across her vaginal area. We believe these circumstances show M.M. was still measurably upset by the incident at the time she talked with her mother. Instead of the highly excited, nervous, and tearful type of excitement exhibited with Penny and Officer Gustafson, M.M became noticeably quieter and quieter in her mother's presence hoping, perhaps, to avoid any discussion of the stressful incident. When ultimately confronted, she clearly avoided going directly to the subject of the defendant's abuse. When the subject could no longer be avoided, she lapsed into nonverbal conduct to relay the information.

We view M.M.'s disposition at the time she talked with her mother virtually palpable evidence that M.M. had neither fabricated nor invented the sexual molestation perpetrated upon her by the defendant. We conclude that under the entirety of the circumstances presented here, her statement to her mother was properly admitted as a spontaneous declaration.

■ The defendant next contends his conviction must be reversed on the basis of the prejudicial comments made by the prosecutor in his closing argument. In the first such comments, the prosecutor

stated:

"[MR. BARSANTI]: The burden of proof is that we have to prove the issues in the case beyond a reasonable doubt. That's our burden. That's the burden in this case. That's the burden in every case.

\* \* \*

MR. BARSANTI: It's the burden of proof of every case in this country, every time a conviction is carried on a criminal case when you read about in a paper or whatever or you hear about it.

\* \* \*

MR. BARSANTI: Whether the—whatever the charge may be, you have to understand that the burden of proof is always the same. The burden of proof is proof beyond a reasonable doubt in every conviction in this country, every time. That's the State's burden. That's our burden in this case."

█ Comments exceeding the bounds of propriety in a prosecutor's closing argument do not become reversible error unless there is substantial prejudice to the accused. (*People v. Baptist* (1979), 76 Ill. 2d 19.) In determining whether a prosecutor's closing statements are prejudicial, reference is made to the content of the language used, its relation to the evidence, and the effect of the argument on the right of an accused to a fair and impartial trial. (*People v. Bragg* (1984), 126 Ill. App. 3d 826, 833.) In deciding whether the defendant was prejudiced, it is appropriate to assess the evidence of his guilt and to determine whether the error was a material factor in his conviction. (*People v. Hartfield* (1985), 137 Ill. App. 3d 679, 688.) The standard of review of an error which affects a Federal constitutional right such as the right to a fair trial is whether it was harmless beyond a reasonable doubt; that is, whether there is a reasonable possibility that the error might have contributed to the accused's conviction. *People v. Foley* (1982), 109 Ill. App. 3d 1010.

Taken in context, we do not believe the alleged error at bar reasonably contributed to the defendant's conviction here.

█ Nor do we find reversible error as the result of the following comment made by the prosecutor during rebuttal argument:

"It's told you that the Defendant entered a plea of not guilty at the beginning of the trial, and of course they did. Of course defendants all have lawyers, as this one does."

The topic of defendant's plea was raised in defendant's closing argument, and, in that respect, the comment was invited by defendant, and he may not complain it was error. (*People v. Gutierrez* (1985), 136

Ill. App. 3d 774, 778; *People v. Clay* (1984), 124 Ill. App. 3d 140, 149.) Further, we believe the comment too isolated and ambiguous to have raised any adverse inference from defendant's retention of counsel as was prohibited in *People v. Meredith* (1980), 84 Ill. App. 3d 1065, or to have constituted reversible error as in *People v. Kennedy* (1975), 33 Ill. App. 3d 857. We find no reasonable possibility that the comment contributed to the defendant's conviction here, particularly since the comment failed even to provoke a timely objection from defense counsel at trial.

■■■ Defendant next complains of this comment by the prosecutor during rebuttal argument:

> "In the opening statements Mr. McCulloch said to you that this was not a serious case. That's what I heard him say, and that's troubling. That's troubling to trivialize this."

Defendant contends the statement attributed to his counsel was false, and in light of the repugnant charge lodged against him, the only effect of this improper argument was to arouse the antagonism of the jury against him.

The statement of defense counsel which was alluded to in part was made in defense counsel's opening statement as follows:

> "What happened back on May 11, 1985, ladies and gentlemen, is very simple and not in any way out of the ordinary."

Defense counsel continued, essentially stating that the defendant and the child had a brief conversation in the park and he left, and that the State's evidence regarding what occurred after he left the park was insufficient to prove him guilty beyond a reasonable doubt. The defendant objected at trial to the prosecutor's comment set forth above on the basis that it was "not a fair characterization" of what he said. We agree it was not a fair characterization, but we fail to perceive that the comment was intended to arouse any antagonism against defense counsel. Moreover, the court admonished the jury that what the attorneys felt was said or was not said was of no consequence. Consequently, we find the comment did not amount to prejudicial error warranting reversal.

■■■ Lastly, the defendant objects to these comments made by the prosecutor during rebuttal argument:

> "And it's our duties as citizens, it's the duty of the courts and the police, of everybody to protect those children. It's a duty of everybody to stop them being exploited by the maulers and the pawers of these babies.

> MR. McCULLOCH: Judge, I object to that type argument.

> THE COURT: Yes, Mr. Barsanti. I think you'll argue the

facts, please.

MR. BARSANTI: It is fair, ladies and gentlemen, that we protect them by letting these people hide behind the youth of a three-year-old?

MR. McCULLOCH: Objection, Judge. I think that's improper argument.

THE COURT: I've already stated that, and I would ask that both parties stick to the facts.

MR. BARSANTI: I guess the younger the better, ladies and gentlemen.

MR. McCULLOCH: I object. That's bad and getting worse.

THE COURT: The jury can determine that after my comments, Mr. McCulloch.

\* \* \*

[MR. BARSANTI]: Now you perform that final function of yours.

The defendant has exercised his rights, and his rights have been protected. He's had the jury trial that the Constitution guarantees.

And now it's time to protect [M.M.'s] rights. It's time to protect the right of all those young children. You show all those people that are going to hide behind that three-year-old, you show all those people that you won't accept that here.

MR. McCULLOCH: Objection. I think that is an improper argument.

MR. BARSANTI: You protect them by your verdict.

THE COURT: Mr. Barsanti, I ask—

MR. BARSANTI: Thank you.

THE COURT: Thank you."

Although the defendant acknowledges that it is proper for a prosecutor to dwell on the evil results of crime and urge the fearless administration of the law (*People v. Cruz* (1983), 119 Ill. App. 3d 868), he asserts the prosecutor's comments here urged the jurors to convict the defendant as part of a concerted effort to deter other lawbreakers, "the maulers and the pawers of these babies."

We agree that the prosecutor's comments, although within the category of those which properly urge the fearless administration of the law, placed undue emphasis on the deterrence of other and future lawbreakers. It is improper for the prosecutor to make statements which are calculated solely to inflame the passions and prejudices of the jury. (*People v. Jones* (1982), 108 Ill. App. 3d 880. But, *cf. People v. Hunter* (1984), 124 Ill. App. 3d 516, 534-35 (where the court found

the prosecutor's argument to the jury about the evils of drug abuse and the need to punish drug pushers was found to be permissible argument concerning the " 'evil results of crime and the benefits of a fearless administration of the law.' ").) We observe that the prosecutor's comments here, though, were made in response to a certain extent to the broad appeal made to the jury in defense counsel's closing argument, to wit:

> "[Discussing the defendant's presumption of innocence and the State's burden of proof beyond a reasonable doubt] It's a protection that you have and you're exercising for every future defendant, knowing how easy it is for the very young, the very elderly, the very infirm, the very biased, the very prejudiced to point a finger and make an allegation, knowing that the police, prosecutors may be there to pick up the band wagon and help you.
>
> That is something that we as a society have not chosen to join in. That's what we mean when we say the State has to prove their case beyond a reasonable doubt."

In *People v. Crossno* (1981), 93 Ill. App. 3d 808, the court found no reversible error had occurred where the prosecutor's comment, which had no purpose but to inflame the jury, was invited to a certain extent by an appeal to sympathy in the defense counsel's closing argument. We likewise find no reversible error here by virtue of these remarks. We do not find that the prosecutor's "crusade" appeal to the jury was a material factor in the defendant's conviction. We believe that the verdict would have been the same even if the comments had not been made and, as such, no reversible error occurred. *People v. Barkauskas* (1986), 147 Ill. App. 3d 360, 369.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

REINHARD and WOODWARD, JJ., concur.