THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWIN EVANS, Defendant-Appellant.

First District (5th Division) No. 86—1079

Opinion filed July 15, 1988.

Sherman C. Magidson, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Patricia Y. Brown, and Laura J. Diamant, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of aggravated criminal sexual assault, criminal sexual conduct and unlawful restraint and sentenced to concurrent terms of 15 years for aggravated criminal sexual assault and three years for unlawful restraint. On appeal, he contends that he was denied a fair trial by (1) the admission of hearsay testimony concerning statements allegedly made by the complainant after the incident; (2) improper and prejudicial cross-examination of his expert witness; and (3) prejudicial and inflammatory remarks and misstatements of the evidence by the prosecutors in their closing arguments.

At trial, the 16-year-old complainant, G.B., testified that the events at issue occurred on July 5, 1986, when she was 14 years old. On that date, she and her friend, Charlene Williams, left her house near 109th and Green Streets in Chicago at about 5:30 p.m. and, on the request of her mother, walked to the home of an acquaintance who had died to find out the new telephone number of the deceased's family. They were walking back toward G.B.'s house when defend-

ant's brother, Edward, called out to Charlene from the porch of his home on the corner of 111th and Green Streets and invited her to look at some pictures taken on his recent graduation from elementary school. As they approached the house, defendant arose from where he had been sitting on the curb on 111th Street with Frank Tolbert, grabbed her arm, said he wanted to speak with her and asked her to come to the porch. While Edward and Charlene were looking at the photographs, defendant asked her if he could speak to her for a moment and, initially, she agreed; but when he said that he wanted to speak to her privately inside the house she refused. Defendant then grabbed her wrists, pulled her inside the front door and locked it. He asked her to accompany him upstairs to help him bring out some empty beer bottles he had left in his room. At first, she declined; but when he said that after helping him she could leave she agreed. When they reached the top of the stairs, he unlocked his bedroom door and after they entered, he relocked it behind them. After picking up several beer bottles, she began walking toward the door, but he jumped in front of her and asked where she was going, to which she responded that she was leaving. He replied "no you're not" and knocked the bottles from her arms and then placed his hands on her thighs. She pushed him away but did not say anything. He then attempted to pull off her shorts and when she resisted, he said that he had a gun in the closet and threatened to "blow [her] brains out." When he began walking toward the closet, she became afraid and told him to stop, whereupon he returned to where she was standing, pulled off her shorts and underwear and pushed her onto the bed. She kicked and screamed, but he told her that she could scream all she wanted because no one would hear her. He then grabbed her arms, pinned her down and raped her. Afterward, she arose from the bed and picked up her clothes, but he grabbed them from her, threw them across the room, and told her that he wasn't "finished with [her] yet." He sat in a chair near the door and ordered her to her knees. When she refused, he repeated his threat to kill her and began walking toward the closet. Once again, she told him to stop. He then sat down, grabbed her by the hair and forced her to perform oral sex. When she raised her head slightly, she saw him ejaculate on his legs and the chair. He ordered her to continue, threatening to get the gun if she refused, but when he heard a noise outside the room he went to the door, unlocked it, looked out, relocked it and then pushed her to the floor and raped her again. He then threw her shorts at her and, before allowing her to leave, said, "I don't expect nobody to hear about this, right?" to which she responded only by shaking her head.

As she came down the stairs, she could hear Charlene outside of the front door screaming to be let in the house. Edward was standing near the front door laughing and as he unlocked it, defendant asked, "Hey, man, you want to go a couple of rounds?" but Edward shook his head. When she exited the house, Charlene, who was on the porch with Jones and Tolbert, asked, "What's wrong with you?" to which defendant replied, "Ain't nothing wrong with her." Except for Tolbert, who was sitting on the step with his head between his legs, the young men all laughed as she and Charlene descended the stairs. Before they left, defendant swung Charlene around, threw her to the ground and then pulled G.B. by the hand, warning her "If you ever tell anybody, I will blow your house up, you and your whole family." On the way back to her house, Charlene repeatedly asked: "What is wrong? What is wrong? I know something is wrong. What is wrong? You can't tell me nothing is wrong. Did he do something to you? Did he hurt you or something?" She then responded, "Yes, he took advantage of me." When Charlene said, "You've got to tell somebody," she answered, "No, I can't tell anybody, because if I tell anybody, he said he is going to blow my house up." Her mother was at home when they arrived there, at about 6:30 p.m., but she did not tell her what had happened because she "was afraid [and] didn't want [her family] to get hurt." She used the bathroom and also washed her hands and face and brushed her teeth. She and Charlene then walked to Charlene's house, where they discussed what she should do about the incident. She explained again to Charlene that she was afraid to tell her parents because she didn't want anyone to be hurt. They left Charlene's house and walked about five blocks to the home of another friend, Steven Bonds, who lived with his sister, Evelyn Reed. When they arrived there she was still very upset and nervous and her eyes were red from crying. After Charlene left a few minutes later, Bonds asked her what was wrong, whereupon she explained what had occurred. After her conversation with Bonds, she encountered Reed in the kitchen. Observing that she was crying and upset, Reed also asked her what was wrong, to which she responded, "He took advantage of me." Reed then asked, "Who, who?" and began to cry. When she responded, "Edwin," Reed inquired, "Who is Edwin?" and then said, "Oh baby, you've got to tell your mama; let's go." Reed drove her home, where she had a conversation with her mother, who then called the police. After speaking briefly to the responding officer, she was transported to the hospital. She arrived there at about 8:30 p.m. and was examined by the emergency room doctor between 11 p.m. and midnight.

On cross-examination, G.B. stated that she had known defendant most of her life and that she had never seen him carrying a gun nor had he ever threatened her. She had never met Tolbert before and was able to tell the police his first name only because she heard Edward introduce him to Charlene. When defendant pulled her inside the house, Tolbert was still seated on the curb and she did not see him again until she exited the house, at which time he was sitting on the porch. She did not know anyone named "Jackie Foggie" and denied seeing anyone else in the house while she was inside with defendant. Defendant did not ejaculate during either of the two times he had intercourse with her. When she returned home, at about 6:30, her mother noticed that she had been crying and asked her if she was upset by the death of the family acquaintance, who had been G.B.'s former babysitter. She answered, "[N]o." Her mother then asked, "[W]as it that bad down there?" to which G.B. also responded, "[N]o, it wasn't that bad." She and Charlene left her house about 20 minutes later, and it was approximately 7:45 when Reed drove her home and she told her mother what had happened earlier. She acknowledged that she did not tell the police that the zipper on her shorts ripped as defendant tried to pull them off, and did not recall whether she told the responding officer that defendant had forced her to perform oral sex.

Charlene Williams' testimony was essentially the same as G.B.'s regarding the events leading to their arrival at the Evans' home. She further testified that at the time Edward called to her to come over to look at the graduation photographs, defendant was sitting on the curb with a friend and they were both drinking. As they walked toward the porch, defendant approached G.B. and asked her to come over and see him. When she declined, he said that he wanted to talk to her, grabbed her by her wrist and walked her across the street to the house. Edward introduced her (Charlene) to Frank Tolbert, who walked from the curb, sat down on the bottom step of the porch and put his head between his legs and his hands on his ears. When Edward came out with the pictures, defendant told G.B. he wished to speak to her privately, inside the house. G.B. said "no" and she (Charlene) also advised her not to go inside. Defendant said "Come on girl," adding "I'm not going to do anything to her, Charlene." He then grabbed G.B. by her wrist, took her inside and closed the door. She (Charlene) remained outside with Edward, Eugene Jones and Tolbert. While they were looking at the pictures, Tolbert went to the side of the house, vomited and then returned to his earlier position on the step. Jones explained that Tolbert, who did not move or say any-

thing thereafter, was drunk. After looking at the photographs, she requested that Edward go into the house and find G.B. He turned the doorknob but the door was locked and he said that he did not have a key. She then rang the doorbell, but when no one answered she asked Edward to go to the rear entrance to locate G.B. He told her that if she wanted to leave to do so alone, but she refused and an argument ensued. She began pounding on the door, and eventually, Edward went around to the back of the house. She remained on the porch pounding on the door and hollering for someone to open it and for G.B. to come out. Eventually, the door was opened and she saw Edward, defendant—who was laughing—and G.B.—who looked disheveled and very upset—standing inside. Before stepping outside, defendant asked Edward if he "wanted to go a couple rounds," in response to which Edward merely shook his head. At first she demanded to know what had happened, but then said, "Let's just go. Forget it. Let's go." She began walking down the stairs but when defendant said to G.B., "Don't move; you're not going anywhere," she turned back, grabbed G.B. by the wrist and urged her to leave. Defendant followed, saying "I told you not to move. Don't make me hurt you," whereupon he grabbed her (Charlene) by her shirt and pushed her to the ground. She screamed, "What did you do to her?" to which defendant replied, "I didn't do anything to her." She got up and they began walking again, but before allowing her to leave, defendant pulled G.B. back and said something which she could not hear. As they were walking north on Green Street, she asked G.B. what had happened. At the end of the block, G.B., who was still very upset and crying, finally responded, "He took advantage of me." She advised G.B. to tell someone because otherwise "it would keep on happening"; but G.B. said that if she told anyone, "he would blow up her house with her family in it." They arrived at G.B.'s home at about 6:30 and after giving her mother the telephone number they had obtained, G.B. brushed her teeth, washed her hands and used the bathroom. She and G.B. then walked to her house, where she again asked, "Exactly what happened?" G.B. then told her that she had "performed an act of oral sex on him by force." She accompanied G.B. to Bond's house, remained there about five minutes and then returned home.

On cross-examination, Charlene stated that the next morning she accompanied G.B. and her mother to court but she did not testify that day. She had never been inside the Evans' home and although defendant, G.B. and Edward were the only persons she saw enter or leave the house while she was there, she did not know whether any other people were already inside.

Evelyn Reed testified that she was at home with her 17-year-old brother, Steven Bonds, when G.B. and Charlene arrived, at about 7 p.m. G.B. was crying and asked to see Bonds. After Charlene left, G.B. and Bonds went into an upstairs family room and she (Reed) returned to the kitchen. When they came down a few minutes later, she asked G.B. "What happened? Why are you crying? What's wrong?" At first, G.B. would not respond but then she stated that someone had taken advantage of her and, when Reed asked her who it was, she mentioned a name. Receiving no answer when she telephoned G.B.'s house, she drove her home, where they were met by G.B.'s mother, who was on the front porch.

G.B.'s mother testified that when G.B. returned home with the telephone number of the deceased friend's family she appeared to have been crying. Referring to the family's reaction to the death, she asked G.B., "Was it that bad?" Although G.B. responded "no," she told her that if she had known it would upset her so·badly, she would not have sent her there. She was sitting on the front porch when G.B. returned home later with Reed. Seeing that G.B. was crying, she asked her what was wrong, and after a conversation, she called the police, who interviewed G.B. at the house and then transported her to a nearby hospital, where she spoke to another officer and was then examined and released.

The responding police officer, Patrick Ryan, testified that he received the radio call of a rape at about 8 p.m. When he arrived at G.B.'s house, she appeared very distraught; she was crying and her eyes were bloodshot. After speaking with her and her mother for about 15 minutes, he proceeded to defendant's home. A woman answered the door and stated that defendant lived there but was not at home; however, as they were speaking, defendant arrived. He explained to defendant the allegations that had been made after which defendant agreed to accompany him to the district police station.

On cross-examination, Ryan stated that it was his recollection that G.B. reported that the incident had occurred at about 7 p.m. As written in his report, she told him that there had been "a couple acts of sexual intercourse." She also told him about the act of oral sex, which he noted in the arrest report but not in the department case report. He did not recall from the notation in his report that "[defendant] forced her to remove her pants" whether G.B. told him that defendant forcibly removed them under the threat of force because his report was merely a summary, not a verbatim account, of the preliminary, investigatory conversations.

Doctor Abdul Loya testified that he performed both general and

pelvic examinations of G.B. at about 1 a.m., and gathered a collection of physical specimens—including vaginal and oral swabs—known as the "Vitullo Kit," which are required by the police department laboratory. In his examination, he "found a fresh blood clot on the hymen indicating a recent injury." On cross-examination, Dr. Loya stated that he saw some blood in the vaginal area and that the hymen was still there but "it was injured—scratched," an injury "not necessarily" caused by sexual intercourse.

On defense, Raymond Lenz, a criminologist employed by the Chicago police department crime lab testified that in examining the specimens from the "Vitullo Kit" he found two strands of human hair which appeared to be similar. No blood or semen was found on the hairs. He then compared them to pubic hair combings taken from G.B. and defendant and determined that the two strands he found were similar to G.B.'s samples and dissimilar from those of defendant. Microscopic and chemical tests of both the vaginal and oral smears were negative for the presence of spermatozoa or semen.

On cross-examination, Lenz stated that the length of time between ejaculation into the vagina and the taking of smears, urination, the normal secretion of vaginal fluids, and the ejaculator's fertility were all factors which could have an effect on the presence or absence of spermatozoa in a vaginal smear. Similarly, factors such as eating, drinking, spitting out, and even normal swallowing could affect the presence of sperm in an oral swab. Over objection, Lenz stated that the negative findings of his tests neither helped nor hurt defendant in that they neither included defendant nor ruled him out.

Detective John Gallagher testified that he was assigned to the case at about 10:30 p.m. and after speaking with Officer Ryan, he went to the hospital, where he had a brief conversation with G.B. She told him that although at first she struggled with defendant, using her hands and feet to fend him off, he warned her that if she did not cooperate he was going to get his gun and "blow her brains out." She said she did not actually see the gun and he did not conduct or order a search for it. She said that defendant tried to pull her shorts off, but that it was she who removed them. She did not mention that her shorts were torn nor did he observe any tears. He could not recall if she did say that he ejaculated on the chair. When he first saw G.B., she was upset and crying a little and was in a "sullen-type mood."

In an interview at the police station, defendant told him that Eugene Jones, Frank Tolbert and a girl named Jackie Foggie were with him at his house at the time in question. Defendant gave him Jones' telephone number but he did not provide any of their ad-

dresses. Attempts to speak with Jones were unsuccessful, and an investigation disclosed that Jackie Foggie had moved away from home and had not been seen nor heard from by her mother or her teachers since a few months before trial.

Carl Harmon, a neighborhood resident, testified that while cutting a lawn across from defendant's house, at about 4:45 p.m., he saw G.B., Charlene and Edward sitting on the porch of the Evans' home looking at pictures. A short time later, he looked up and noticed that G.B. was no longer there. He did not see her again after that, nor did he see defendant, Tolbert or anyone else in front of the house at any time. He was in the process of cutting the Evans' lawn when the police arrived, at about 5:30 p.m. After determining that he was not defendant, they knocked on the front door and then left without making an arrest.

Defendant's brother, Edward, testified that he was sitting on his front porch looking at graduation pictures he had taken a few days earlier when he saw G.B. and Charlene walking down Green Street. He saw a picture of Charlene among the photographs and asked her if she wanted to come over to see them. At this time, defendant was inside the house with Tolbert, Jones and Foggie. Charlene and G.B. came over to the porch and as he and Charlene were looking at the pictures, G.B. asked to see defendant's prom pictures. Edward told her that they were in the house, that defendant was upstairs and that the door was open. G.B. entered the house while he and Charlene remained on the porch looking at the pictures and talking. About 15 minutes later, Charlene asked him to go in the house to find G.B., but just as he was entering the house she came out and the two girls then left. On cross-examination, he denied the version of events testified to by G.B. and Charlene but acknowledged that he did not contact the police after defendant's arrest to tell them what had actually occurred.

Frank Tolbert testified that on the afternoon in question, he, defendant, Jackie Foggie and Eugene Jones were in defendant's bedroom listening to the radio, talking and drinking a few beers in celebration of defendant's recent high school graduation when G.B. came into the room. She asked defendant who Foggie was and what she was doing there. Defendant introduced Foggie as his girlfriend, whereupon G.B. "got an attitude," *i.e.*, she looked very disturbed, and left the room. He (Tolbert) followed her downstairs into the living room and asked her what the problem was, adding that "your boy ain't s---." He offered her a beer, which she accepted and asked her for a "joint." As they smoked, they became a little "high" and he

made a pass at her. He pulled down her shorts and panties and also his own shorts and attempted to have intercourse with her, but as he tried to insert his penis, she told him it hurt and to stop. Although he was somewhat angry, he complied. She pulled up her shorts and walked out the front door. He returned upstairs but did not mention the incident to defendant; and about 15 minutes later, he left the house with defendant, Foggie and Jones and then went home.

He, too, specifically denied Charlene's and G.B.'s testimony that he and defendant were drinking beer on the curb and that he was drunk and became sick. He learned of defendant's arrest a few days later, and 11 days after the incident, he voluntarily went to the criminal courts building for the purpose of attending a preliminary hearing on this matter and testifying to what had occurred because he knew that G.B.'s allegations against defendant were not true. At first, he stated that he spoke to assistant State's Attorneys there and told them what had occurred, but that he did not take an oath or testify. He then stated that he took an oath and testified and, finally, he said that he made a statement to two detectives in a conference room but could not recall if he was under oath. The detective to whom he spoke did not tell him his name or ask him to testify.

Defendant testified that when he saw G.B. in front of her home at about 1 p.m. on July 5, and told her about "the occasion" that afternoon, she said that she would come over later that day. He and his girlfriend, Jackie Foggie, arrived at his house at about 3 p.m. and went up to his bedroom. At about 4:30, Tolbert and Jones arrived and joined them. They were talking about their future plans and celebrating his graduation by drinking a few beers. About 20 minutes later, he saw G.B. walking up the stairs toward his bedroom and invited her to come in. When she entered the room, she said, "Well, who's this?"—referring to Foggie, who was seated on the bed. He responded, "Excuse me, I want to introduce you to Jackie." G.B. said, "Well, I was coming up to look at your prom pictures, but I see you are entertaining," and then turned around and left the room. Tolbert followed her out and he did not see her or Tolbert again that day. He left his house shortly before 6 p.m. and went to play pool at the home of another friend. He denied being out in front of the house that afternoon or having any sexual contact with G.B. on that day or any other. When he learned, through a friend, that the police had been at his house looking for him, he came home. His mother then called the police and he voluntarily went to the police station where he was later placed under arrest.

On cross-examination, defendant stated that he gave the police a

summary of the events to which he testified. He denied telling them that while in his room with his friends he heard a noise downstairs and when he went down, he saw G.B., Charlene and his brother sitting on the couch in the living room looking at pictures and that he greeted them. He also denied that he first told the police that he was at a friend's playing pool between 4 and 8 p.m. or that he later admitted to them that he had the time mixed up and had lied. He stated that the police had reworded and revised his statement in several respects and that he told them that it was because the statement they prepared was not true that he refused to sign it.

Detective Gallagher testified, in rebuttal, that when he spoke to defendant at the police station, defendant told him that he was at home with his friends, Foggie, Tolbert, Jones and Robert Rush, and that G.B. and Charlene were also in the house looking at photographs with his brother. Defendant said that the group broke up at about 4 p.m., at which time he went to a friend's house where he played pool until 8 p.m., but after he (Gallagher) made a telephone call to that friend, defendant admitted that he did not know what time he had left his house and that he had just "made up" the time he spent at the friend's house. The written statement taken by the assistant State's Attorney was an accurate account of what defendant told them in the interview; and he (Gallagher) denied that defendant ever stated that his reason for refusing to sign the statement was that it did not accurately reflect what he said.

After argument by counsel, the jury found defendant guilty of aggravated criminal sexual assault, criminal sexual conduct and unlawful restraint. Sentences were imposed, defendant's post-trial motion was denied, and this appeal followed.

OPINION

Defendant first contends that he was denied a fair trial by the effect of hearsay evidence introduced through the testimony of G.B., Charlene and Reed regarding various statements allegedly made by G.B. on the day in question. He argues that the statements did not meet the criteria for exemption from the hearsay rule either as "prompt outcries" or "corroborative complaints" because they were not spontaneous declarations but, rather, responses to "intense questioning" as to what had occurred and the identity of the perpetrator. It is his position that he "was tried more on the basis of what [G.B.] said to others than on the basis of her descriptions of what had happened."

In support of his contention that none of the statements testified

to were prompt outcries admissible to corroborate G.B.'s testimony, defendant proffers that (1) according to G.B., it was only after Williams asked her several times "What is wrong? I know something is wrong. You can't tell me nothing is wrong. Did he do something to you?" that she responded, "Yes, he took advantage of me"; (2) Charlene testified that it was not until they reached the end of the block that G.B. finally responded to her questions, "What happened?" and "What did he do to you?" by stating "He took advantage of me"; (3) she failed to promptly complain to her mother even though she had the opportunity when, upon her arrival home immediately after the alleged incident, her mother commented that she appeared distraught and questioned her as to the cause; (4) it was only after they reached G.B.'s house and Charlene asked again, "Exactly what happened?" that G.B. responded that she "performed an act of oral sex on him by force"; (5) G.B. also acknowledged complaining to Steven Bonds only because he "saw that something was wrong *** and he wanted to know"; and (6) it was established both by G.B.'s and Reed's testimony that she said nothing to Reed upon arriving at the house, and that it was only after Reed asked why she was upset that she told Reed "he took advantage of me" and, in response to Reed's repeated inquiry, "Who, Who?" stated that "he" was defendant.

■ Generally, the testimony of a witness cannot be bolstered by showing that she made similar statements out of court; however, an exception is made in sexual assault cases where the prosecuting witness made a prompt complaint of the incident. (*People v. Harris* (1985), 134 Ill. App. 3d 705, 480 N.E.2d 1189.) In such cases, evidence that a complaint was made is admissible to corroborate the complainant's testimony. The reasoning underlying the exception is that it is entirely natural that the victim of a forcible sexual assault would speak out regarding it and, conversely, that the failure to do so would, in effect, be evidence that nothing violent had occurred. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; *People v. Nelson* (1986), 148 Ill. App. 3d 811, 499 N.E.2d 1055; *People v. Harris* (1985), 134 Ill. App. 3d 705, 480 N.E.2d 1189.) While there is no fixed time limit within which the complaint should be made to qualify as "prompt," it must have been made without any inconsistent or unexplained delay, and it must have been voluntary and spontaneous rather than the product of a series of questions. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; *People v. Merideth* (1987), 152 Ill. App. 3d 304, 503 N.E.2d 1132; *People v. Nelson* (1986), 148 Ill. App. 3d 811, 499 N.E.2d 1055; *People v. Williams* (1986), 146 Ill. App. 3d 767, 497 N.E.2d 377.) Finally, since the sole purpose of the exception is to re-

but any presumption which might arise from the complainant's silence, only the fact of the complaint is admissible; neither the details of the complaint nor the identity of the named perpetrator is admissible. *People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; *People v. Fryman* (1954), 4 Ill. 2d 224, 122 N.E.2d 573; *People v. Server* (1986), 148 Ill. App. 3d 888, 499 N.E.2d 1019.

■ The State points out, and defendant concedes, that not all of the testimony he now challenges was objected to at trial. It is fundamental that the failure to make a timely objection to the admission of allegedly improper evidence constitutes a waiver for purposes of review and that hearsay evidence admitted without objection may be considered and given its natural probative effect. (*People v. Merideth* (1987), 152 Ill. App. 3d 304, 503 N.E.2d 1132.) Defendant argues, however, that it was the cumulative effect of all of the testimony, some of which was objected to at trial, that resulted in the prejudice and served to deny him a fair trial. Although an error in the admission of hearsay testimony ordinarily is considered harmless where the testimony was supported by other corroborative evidence, we also recognize that where there is a lack of substantial corroborative evidence, there is a danger that the repetition of the complainant's version of the incident through hearsay testimony may in some cases contribute to the jury's verdict. *People v. Johnson* (1986), 149 Ill. App. 3d 128, 500 N.E.2d 657; *People v. Andino* (1981), 99 Ill. App. 3d 952, 425 N.E.2d 1333; *People v. Jacobs* (1977), 51 Ill. App. 3d 455, 366 N.E.2d 1064.

■ We believe, and defendant does not seriously dispute, that the statements at issue were "prompt" in that there was no significant or unexplained lapse of time between the incident and G.B.'s complaints of it. Her testimony, much of which was directly corroborated by Charlene, regarding the emotional trauma she experienced during and as a result of the assault; defendant's warning to her in the house not to tell anyone about it; that defendant and the other young men all laughed when she exited the house and descended the front stairs with Charlene; and that when Charlene attempted to lead her away from the house, defendant pushed Charlene to the ground and then pulled G.B. off to the side where he threatened, "If you ever tell anybody, I will blow your house up, you and your family," clearly describes a situation wherein she could reasonably believe that making a complaint at that time not only would be a futile act but a dangerous one as well. Based on this testimony, we believe that her statement to Charlene as they walked home was made as soon as was practicable both in time and distance and that the remaining statements at issue,

having been made in the course of an unbroken sequence of events during the two hours following the incident and her initial disclosure to Charlene, were sufficiently prompt so as to also satisfy the temporal requirement of the corroborative-complaint exception.

We are not persuaded otherwise by her delay in telling her mother about the incident. A belief by her that while she could prevail upon her friends to maintain silence, complaining to her mother would cause some action to be taken against defendant and thereby prompt him to carry out his threats against her family is an entirely reasonable one which explains her initial reluctance to reveal what had occurred.

■ It is defendant's position, however, that irrespective of their timing, testimony regarding the statements was inadmissible because they were not spontaneous but, rather, were the product of "intense questioning." As stated above, a complaint made *only* as a result of questioning ordinarily does not qualify as a corroborative complaint. (*E.g., People v. Harris* (1985), 134 Ill. App. 3d 705, 480 N.E.2d 1189.) However, the fact that a statement was made in response to questions does not automatically deprive it of the voluntariness and spontaneity necessary to establish its admissibility. (*People v. Goebel* (1987), 161 Ill. App. 3d 113, 514 N.E.2d 60; *People v. Watts* (1985), 139 Ill. App. 3d 837, 487 N.E.2d 1077; *People v. Server* (1986), 148 Ill. App. 3d 888, 499 N.E.2d 1019.) Responses to general inquiries such as "What happened?" or other, similar open-ended questions have been held admissible (see, *e.g., People v. Merideth* (1987), 152 Ill. App. 3d 304, 503 N.E.2d 1132; *People v. Webb* (1984), 125 Ill. App. 3d 924, 466 N.E.2d 936; *People v. Sanchez* (1982), 105 Ill. App. 3d 488, 434 N.E.2d 395). A determination as to admissibility requires consideration of all the circumstances surrounding the making of the statement, the key inquiry being whether the statement would have been made had the questions not been asked. *People v. Watts* (1985), 139 Ill. App. 3d 837, 487 N.E.2d 1077; *People v. Harris* (1985), 134 Ill. App. 3d 705, 480 N.E.2d 1189; *People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865.

■ With respect to G.B.'s first complaint to Charlene as they walked home, we note again G.B.'s testimony regarding defendant's threats and, according to both girls, that at the time they left defendant's house Charlene was in a highly agitated state stemming from her concern for G.B. and the behavior of defendant and the other young men and that G.B. was disheveled, upset and crying. In these circumstances, it was entirely natural that Charlene would immediately question G.B. concerning what had occurred and that G.B. would initially hesitate to volunteer information or to respond to

Charlene's inquiries. Moreover, although phrased in varying terms, *i.e.*, "What's wrong? Did he do something to you?" and the like, the essence of each of Charlene's questions was "What happened?" We find no error in the admission of the testimony that G.B. stated, "He took advantage of me."

Likewise, G.B.'s statement to Charlene that she "performed an act of oral sex on him by force" was made within minutes of the complained-of incident in response to Charlene's general inquiry, "Exactly what happened?—referring to what G.B. meant when she said that he had "taken advantage" of her; and we therefore believe that it was merely a continuation of the above-described conversation and was admissible as a corroborative complaint of a sexual assault.

■ As to G.B.'s testimony that she told her friend, Steven Bonds, what happened because "he saw that [she] was upset and wanted to know, we note that the record does not disclose the nature or extent of his queries, if any, which constituted his "wanting to know." However, the fact that G.B. sought him out immediately after the incident indicates that she considered him a person she trusted and with whom she could feel secure taking into her confidence at a time when she was fearful of telling her mother and thereby endangering her family's safety. (*E.g., People v. Nelson* (1986), 148 Ill. App. 3d 811, 499 N.E.2d 1055; *People v. Williams* (1986), 146 Ill. App. 3d 767, 497 N.E.2d 377.) Furthermore, because she testified only that "[she] told him what happened," we find any error in the admission of this testimony harmless beyond a reasonable doubt.

■ Regarding G.B.'s conversation with Reed, we note that although the complaint was prompt and made in response to a general inquiry as to the reason why she was upset, G.B.'s testimony that after saying "he took advantage of me," she named defendant as that person was improper since, as stated earlier, only the fact of the complaint and not the details (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25), or identity of the person named (*People v. Fryman* (1954), 4 Ill. 2d 224, 122 N.E.2d 573), is admissible. However, in the light of G.B.'s positive and unwavering testimony that it was defendant who raped and sexually assaulted her, we conclude that any impropriety in the admission of this testimony, to which defendant made no objection, was not so harmful as to constitute plain error. (*Cf. People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164 (admission of the hearsay testimony of a police officer concerning the identification of defendant was merely cumulative and, thus, harmless error).) Similarly, we are of the opinion that Reed's testimony on this matter—which was limited to the facts that G.B. was upset and crying; that

she explained as the cause of her upset to be that "he took advantage of me" and that she then "mentioned a name"—while perhaps unnecessarily repetitive, was so brief and contained so few details that it could not have resulted in prejudice to defendant.

Defendant next contends that the trial court erred in permitting the prosecutor to question expert defense witness, Raymond Lenz, regarding a hypothetical situation necessitating the consideration of hearsay information and to elicit from him an opinion on an ultimate issue in the case.

It is well settled that the scope of cross-examination is largely within the discretion of the trial court and its rulings will not be overturned unless an abuse of that discretion results in manifest prejudice to the defendant. (*People v. Wright* (1985), 111 Ill. 2d 128, 490 N.E.2d 640.) In this case, Lenz testified on direct examination that he had performed thousands of tests in his 7½ years as a laboratory criminologist for the police department and that the chemical and microscopic tests of the physical specimens taken from G.B. at the hospital were negative for the presence of sperm or semen. During cross-examination, the prosecutor asked Lenz whether he found semen in every sexual assault case where ejaculation into the vagina had occurred. Defense counsel's objection, on the ground that Lenz would not have firsthand knowledge whether ejaculation occurred, was overruled; but before Lenz could respond the prosecutor asked whether he sometimes knew "what had happened" to the person whose specimens he was testing. The following colloquy then took place:

"A. [Lenz]: Sometimes we know the background information, sometimes we don't; that really doesn't make any difference to us. We just examine what we are given and made an objective *** finding as to what is there or what is not there.

Q. [Prosecutor]: So if you got a copy of the police report, you might know or if you didn't, you might not?

DEFENSE COUNSEL: Objection

THE COURT: Sustained.

Q. Now, calling your attention back to my question before *** if you have [a case] where there has been an ejaculation into the vagina area, are there cases that you don't find semen or spermatazoa?

DEFENSE COUNSEL: Objection.

THE COURT: Objection's overruled. You may answer.

A. Yes, there is [*sic*].

Q. And that is actually when you know from the report of the prior cases that there has been ejaculation into the vaginal

area of the victim, is that correct?

 A. In some cases either by reading the Case Report or talking to the State's Attorney or detectives or someone like this."

It is defendant's position that this line of inquiry was improper because it was based on and elicited incompetent, inadmissible hearsay evidence, *i.e.*, that statements by authorities and in police reports, rather than any direct, personal knowledge that ejaculation had occurred in a given case, were the bases of his conclusion that sperm is not always found in all cases where ejaculation has occurred.

■ Initially, we note that defendant's objection to the prosecutor's question regarding whether or not Lenz knew from the police reports whether ejaculation had occurred was sustained by the trial court. Having failed to object, however, to the rephrased version of that very same question, defendant has waived any error in the admission of Lenz's testimony referring to the case reports and conversations with police and attorneys.

■ Moreover, although we believe that the questions were, at the very least, inartfully phrased in that they were not posed in the form of a hypothetical situation of the type permitted to elicit an expert opinion based on facts not in evidence (*e.g., Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140), we do not find this to be fatal to the admissibility of Lenz's testimony. G.B. testified that defendant ejaculated while forcing her to perform oral sex and immediately thereafter engaged in intercourse with her. It was defendant's position that if her testimony were true, residual amounts of sperm should have been, but were not, found by Lenz in his tests of the specimens taken from her. In view thereof, we believe that the State was entitled to attempt to elicit from Lenz (a) testimony, based on his training and experience, that numerous factors such as the passage of time and the occurrence of various activities and bodily functions can diminish or eliminate any traces of sperm or semen and (b) his expert opinion that, consequently, an absence of sperm in test samples does not automatically establish that ejaculation did not occur. Although we believe that the questions should have been posed in a more appropriate sequence and manner, the substance of his testimony when read in its entirety was admissible expert evidence and, thus, we see no prejudice to defendant in this regard. In any event, the jury was aware of the basis of Lenz's testimony as well as the nature of defendant's objections to it and, therefore, was adequately equipped to determine its weight and credibility. See *People v. Wright* (1985), 111 Ill. 2d 128, 490 N.E.2d 640.

Defendant also argues that the trial court improperly allowed the State to invade the province of the jury by eliciting from Lenz an opinion on an ultimate issue in the case. He posits that it was error to permit Lenz to respond, over defense objections, to the prosecutor's queries as to whether it was correct that the negative test findings "don't help and they don't hurt [defendant]" and that the test results "don't rule him out and don't include him." Expert testimony on scientific matters not within the knowledge of the jury may be admitted even though the expert opinion coincides with an ultimate issue of fact. (*People v. Prather* (1985), 138 Ill. App. 3d 32, 485 N.E.2d 430; *People v. Goolsby* (1977), 45 Ill. App. 3d 441, 359 N.E.2d 871.) In our view, the tests about which Lenz testified were sufficiently technical so as to render an interpretation by him of the results of some assistance to the jury. Furthermore, since Lenz stated, in effect, that the tests were inconclusive, we fail to see how his opinion can be characterized as decisive of an "ultimate issue" or in what way defendant was harmed. To the contrary, there is a reasonable possibility that testimony regarding ambiguities in or the inconclusiveness of scientific test results might raise some doubt in the minds of jurors as to the defendant's guilt. Indeed, defense counsel in this case strenuously argued that the very proposition, *i.e.*, that the absence of conclusive findings linking defendant to the offense was evidence that he was not G.B.'s assailant. We therefore find defendant's claim of prejudice to be without merit.

Defendant's final contention is that he was denied a fair trial by the prosecutors' improper arguments "which included misstatements of law and fact as well as inflammatory appeals to the jury's prejudice." We have repeatedly held that a prosecutor is allowed considerable latitude in closing argument as long as the comments are based on the evidence or reasonable inferences therefrom. (*People v. Williams* (1986), 146 Ill. App. 3d 767, 497 N.E.2d 377; *People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929.) Moreover, improper remarks do not warrant reversal unless they are so prejudicial as to constitute a material factor in defendant's conviction (*People v. Merideth* (1987), 152 Ill. App. 3d 304, 503 N.E.2d 1132), or otherwise deny defendant a fair trial (*People v. Branch* (1987), 158 Ill. App. 3d 338, 511 N.E.2d 872). Furthermore, a defendant may not assert such prejudice where he or his counsel have provoked or invited the remarks of which he complains. *People v. Branch* (1987), 158 Ill. App. 3d 338, 511 N.E.2d 872; *People v. Piscotti* (1985), 136 Ill. App. 3d 420, 483 N.E.2d 363.

Defendant first asserts that at the outset of his argument the

prosecutor "launched into an attack on the defense witnesses" by (1) opining that Carl Harmon had an "obvious motive" to fabricate "because he is a friend of the defendant" even though there was no evidence of such a friendship; (2) improperly stating that defendant's brother, Edward, did not intervene in defendant's behalf by telling the police officer, at the time of defendant's arrest or at any time thereafter, what he testified to at trial notwithstanding the evidence that Edward was not at home when the police were there; and (3) misstating the evidence and referring to matters not in the record to discredit the testimony of Frank Tolbert.

Initially, we note that the remarks concerning Harmon and Edward, among others of which he now complains, were not objected to at trial and, thus, are not properly before us for review. Furthermore, the prosecutor is entitled to comment on the credibility of the witnesses (*People v. Townsend* (1985), 136 Ill. App. 3d 385, 483 N.E.2d 340) and inconsistencies in their testimony (*People v. Ross* (1978), 60 Ill. App. 3d 857, 377 N.E.2d 230), as long as the comments are fair inferences from the evidence (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847).

 Considering that Harmon's testimony not only contained internal inconsistencies but was generally inconsistent with any of the other witnesses, including defendant, whom he testified he had known for about 10 years, we believe that the prosecutor's remarks were reasonable inferences drawn from the evidence. The remarks regarding defendant's brother were similarly proper since they were based directly on statements made by him on cross-examination wherein he agreed that he was at home "when the police came to get [defendant] or learned about it shortly thereafter" but that he did not go to the police station that night or contact the police at any time thereafter to tell them what he testified to at trial.

With respect to the remarks on the credibility of Frank Tolbert, we note first that the factual inconsistencies and omissions in Tolbert's testimony—particularly with regard to where he went, the identity and number of persons to whom he spoke and whether or not he testified at any type of hearing on the day he claimed to have gone to the Criminal Courts building to inform the authorities that it was he, not defendant, who had been involved in a sexual encounter with G.B. at defendant's house—were both numerous and glaring. For example, he testified, in response to defense counsel's inquiry, that he had attended a preliminary hearing and told the assistant State's Attorney his account of what had occurred on the day in question. Although he repeated at the outset of re-cross-examination that he had

taken an oath and testified at a preliminary hearing, a few moments later he said he could not recall whether he took an oath but that he had given a statement to two detectives. Later, however, he stated that he had spoken to only one detective whose name he was never told. In our view, these inconsistencies and omissions were entirely proper subjects for scrutiny by the prosecutor in closing argument.

■■ Furthermore, since it was defense counsel who first injected, during redirect examination of Tolbert, the subject of a preliminary hearing, defendant cannot now be heard to complain of the prosecutor's reference to such a hearing in commenting on the consistency of G.B.'s and Charlene's statements "since day one at preliminary hearings, to beat officers, to detectives, to states' attorney's," particularly since the comment did not even draw an objection from defense counsel. Likewise, since Tolbert testified to the existence of a detective to whom he purportedly made a statement which was consistent with his testimony, the prosecutor's remarks on defendant's failure to produce or even identify that detective were legitimate comments on the evidence and were invited by the defense. See *People v. Mays* (1972), 3 Ill. App. 3d 512, 277 N.E.2d 547.

■■ Defendant also asserts that the prosecutor improperly accused defense counsel of "a total misstatement" of Doctor Loya's testimony regarding the findings of his internal examination of G.B. and then "launched into a total misstatement of her own" by arguing that the Doctor had never testified that her hymen was intact but, rather, that it had been "ruptured." While it is true that counsel should refrain from making comments tending to disparage the integrity of opposing counsel (*People v. Townsend* (1985), 136 Ill. App. 3d 385, 483 N.E.2d 340), we do not believe that the isolated remark here in the context of the argument as a whole was so egregious as to have prejudiced defendant.

■■ It is also our view that the prosecutor's comments on the medical findings were to a large extent invited by defense counsel's argument. In reviewing the medical evidence, defense counsel first stated, "[n]ow remember, this girl was a virgin. You heard the doctor say her hymen was still there. *** He examined it. It had a scratch on it," and then he proceeded to question whether it was possible that someone who had been raped twice would suffer only a minor injury such as the one found. It was in response thereto that the prosecutor stated that Doctor Loya had not testified that the hymen was "intact" and then characterized the injury and clotted blood found as evidence of a "rupture" of the type consistent with the sexual acts testified to by G.B.

We believe that this was fair rebuttal to defense counsel's argument suggesting that the medical evidence was wholly inconsistent with the occurrence of a rape. In any case, we also note that no objection was made to these remarks and that the trial court reminded the jury at the outset of trial, during argument and in its instructions that counsel's remarks were not evidence and that if they conflicted with the evidence they were to be disregarded. It is presumed that jurors follow the instructions given them and properly perform their function as final arbiters of any factual disputes in the evidence. Thus, even assuming any slight misstatements of evidence, we see no prejudice to defendant. See *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.

Finally, defendant argues that the prosecutors attempted to inflame the passions of the jurors and prejudice them against him by arguing that defense counsel had subjected G.B. to humiliation in court. The comment of which he complains occurred in closing argument wherein the prosecutor referred to "the humiliation this man here put her through." When read in context, however, it is clear to us that the prosecutor was referring to defendant, not defense counsel, and thus, we find no impropriety. Defendant also describes as inflammatory the prosecutor's argument that the reason victims of sexual assaults fail to come forward is because they fear being subjected to the rigors and humiliation that result from an accused, like defendant, exercising his right to plead not guilty and go to trial, and that by finding defendant guilty, the jurors could help to remedy this problem. As defendant acknowledges, the prosecutor may comment on the evils of crime and urge fearless administration of the law (*People v. Merideth* (1987), 152 Ill. App. 3d 304, 503 N.E.2d 1132), and we do not believe that the brief comments made by the prosecutor at the close of rebuttal argument advising the jury that it was in a unique position to send a message to the citizens of the community that jurors will not be "fooled" and that "their daughters can walk down the street without fear of people of [defendant's] ilk" exceeded the bounds of propriety in that regard.

In summary, we have considered defendant's contentions in the light of the record in its entirety and find from (a) the totality of evidence presented by the State, including the clear, articulate, unwavering and essentially uncontradicted testimony of G.B., which was substantially corroborated by Charlene Williams and the other State witnesses and, conversely (b) the inconsistencies and contradictions in the evidence presented by the defendant, and (c) the conduct and rulings of the trial court throughout the proceedings, that defendant re-

ceived a fair trial and that there were no errors of sufficient magnitude to have so prejudiced him as to constitute material factors in his conviction.

For the reasons stated, defendant's convictions and sentences are affirmed.

Affirmed.

LORENZ, P.J., and MURRAY, J., concur.